STATE OF IOWA, Appellee, v. JEFF HANER, Appellant.

WORDS AND PHRASES: "Imbecility of Mind." The term "imbecility of mind," as used in Sec. 4758, Code, 1897, while being one hardly capable of exact or comprehensive definition, is naturally applied to a lack of normal mentality not so complete or absolute as in the condition we call "idiocy," but greater and more marked than in the cases to which are applied the term "feeble-mindedness."

RAPE: Want of Consent of Female—"Imbecility of Mind." The protection of Sec. 4758, Code, 1897, making it a crime to have carnal knowledge of a female of "imbecility of mind," is not restricted to cases of complete or absolute imbecility, but also includes those who, while having some degree of intellectual power, and some capacity for instruction and improvement, are still so far below the mental and natural strength that they can offer no effectual resistance to those who take advantage of their weakness to attempt to have sexual intercourse with them, and includes those who, by reason of mental inferiority, are incapable of knowing and realizing the moral guilt of their act; but does not include those who are endowed with mental capacity to know the right and wrong of their conduct, but yield to intercourse under the influence of temptation or passion or inclination to vice.

INSANE PERSONS: Mental Capacity—Normal Mind. For the purposes of the law, a "normal mind" is one which, in strength and capacity, ranks reasonably well with the average of the great body of men and women who make up organized human society, and by common consent are recognized as sane and competent to perform the ordinary duties and assume the. ordinary responsibilities of life; and the special protection of the law is for those individuals who fall so far below the average in mental strength that the statutes which are found reasonably sufficient for the community in general do not afford them an adequate shield against outrage.

RAPE: Want of Consent of Female—"Imbecility of Mind." Evidence reviewed in an action for rape, and held insufficient to show that the female in question was a person of "imbecility of mind," within the meaning of Sec. 4758, Code, 1897, making it a crime to have carnal knowledge of a female of such "imbecility of mind" as to prevent effectual resistance.

APPEAL AND ERROR: Review—Questions of Fact, Verdicts, and
5  Findings—Substantial Support Necessary. While the Supreme
Court will not overlook the fact that the trial judge and jury
have an opportunity to observe the demeanor and appearance
of witnesses, in so far as relates to the question of veracity
and the weight to be accorded to the evidence of pertinent facts,
and is ordinarily disposed to sustain their findings, yet there
must be some evidence in the record which, if true, will afford
substantial support for such findings.

CRIMINAL LAW: Nature and Elements of Crime—Rape—''Imbe-
6  cility of Mind''—Proof Beyond Reasonable Doubt. In a prose-
cution for rape, under Sec. 4758, Code, 1897, on the ground of
"imbecility of mind," the alleged imbecility of the woman is
an essential element, and the fact of such imbecility must be
established beyond a reasonable doubt.

*Appeal from Harrison District Court.*—THOMAS ARTHUR,
Judge.

JULY 10, 1919.

THE indictment accused defendant of the crime of hav-
ing carnal knowledge of an imbecile, who is described in
the charge as a "female naturally of such imbecility of
mind as to prevent effectual resistance." There was a plea
of not guilty. Upon trial to a jury, defendant was con-
victed, and appeals.—*Reversed.*

*Burke & Welch,* and *Frank Tamisiea,* for appellant.

*H. M. Havner,* Attorney General, and *F. C. Davidson,*
Assistant Attorney General, for appellee.

WEAVER, J.—The sufficiency of the evidence to sustain
the conviction is challenged on several grounds; but, with-
out attempting to set out the testimony, generally we find
that, with a single exception, the facts con-
1. WORDS AND   stituting all the essential elements of the
PHRASES:
"imbecility of   crime charged find ample support in the
mind."
record.

The exception referred to which requires serious attention is the proof relied upon by the State to support the allegation that the young woman, Mabél Palmer, is an imbecile, within the meaning of the statute. The provision of the statute under which the indictment was returned is as follows:

"If any person  *  .*  *  have such carnal knowledge of an idiot or female naturally of such imbecility of mind or weakness of body as to prevent effectual resistance, he shall be punished  *  *  *." Code Section 4758.

The term "imbecility of mind" is one hardly capable of exact or comprehensive definition. It is generally applied to a lack of normal mentality not so complete or absolute as exists in the condition we call idiocy, but greater and more marked than in cases to which, in ordinary parlance, we apply the milder term "feeble-mindedness." Though this distinction or gradation may not have recognition in the terminology of science, it does exist in popular usage, and has had judicial approval. In *Francke v. His Wife*, 29 La. Ann. 302, dealing with this subject, the court says:

" 'The term idiot is applied to those who, from original defect, have never had mental power.' " It is " 'not here a loss or perversion of what has once been acquired, but a state in which, from defective structure of the brain, the individual has never been able to acquire any degree of intellectual power.  *  *  * There is a state scarcely separable from idiocy, in which the mind is capable of receiving some ideas and of profiting to a certain extent by instruction. Owing, however, either to original defect or to one proceeding from arrested development of the brain, the minds of such persons are not capable of being brought to a healthy standard of intellect. This state is called imbecility.' "

In the same case it is further said that "imbecility is

idiocy in a minor degree." The Illinois court speaks of an imbecile as being one "destitute of strength either of body or mind; weak, feeble, * * * decrepit." *Campbell v. Campbell*, 130 Ill. 466.

In *Delafield v. Parish*, 1 Redf. Sur. (N. Y.) 1, 115, it is said that imbecility "is that feebleness of mind which, without depriving entirely the person of the use of his reason, leaves only the faculty of conceiving ideas the most common, and which relate almost always to his physical wants and habits."

But, in construing our statute, we are not disposed to go to the full extent suggested by some of these authorities, and may concede that the protection of the law is not restricted to cases of complete or absolute imbecility, but includes, as well, those who, while having some degree of intellectual power and some capacity for instruction and improvement, are still so far below the normal in mental strength that they can offer no effectual resistance to the approach of those who take advantage of their weakness to have or attempt sexual intercourse with them. This would, of course, include those who, by reason of mental inferiority, are incapable of knowing or realizing the moral quality of their act, and are, therefore, also incapable of giving rational consent.

2. RAPE: want of consent of female: "imbecility of mind."

On the other hand, it manifestly does not include those who are endowed with mental capacity to know the right and wrong of their conduct in sexual matters, but yield to intercourse under the influence of temptation or passion or inclination to vice. In other words, it is lack of mental capacity, and not lack of moral quality and strength, which calls the statute into action. For the purposes of the law, a normal mind is one which, in strength and capacity, ranks reasonably well with the average of the great body of men and women who make up organized human soci-

3. INSANE PERSONS: mental capacity: normal mind.

ety in general, and are, by common consent, recognized as sane and competent to perform the ordinary duties and assume the ordinary responsibilities of life. In this great body of individuals there are to be found, of course, many grades and degrees of mental capacity and an infinite variety of mental qualities, and a person is not to be classed as imbecile or subnormal, simply because he or she is found to be, in some small degree, below the ideal standard, nor is it for such that the legislature undertakes to provide special protection. Such protection is provided for those individuals who fall so far below the average in mental strength that the statutes which are found reasonably sufficient for the community in general do not afford them an adequate shield against outrage.

We have read with care the record in this case, and are strongly impressed with the view that the young woman against whom the alleged offense was committed is not a person of imbecile mind, within the meaning of the statute, and that, because of this defect in the proof, the verdict of guilty cannot be sustained. We cannot attempt to set out the testimony as a whole, but will outline in brief so much as is required to indicate the reasons for our conclusion.

4. RAPE: want of consent of female: "imbecility of mind."

The young woman, Mabel Palmer, is 31 years of age, and, as a witness on the trial, she testifies with unusual clearness as to the principal facts. As to the following, there is little, if any, dispute, except as it is put in issue by the defendant's plea of not guilty.

Mabel's home was in Logan, Iowa. She first met the defendant on July 4, 1916, at a celebration, where they were introduced by her niece. During the interim between that date and the following November, they met several times. On two or more occasions, he called at her home, and once, at least, they went nutting together. During all this period,

she says, defendant treated her respectfully, and made no improper approaches. In November, Mabel and her mother had put up a quantity of fruit, which they desired to send to a niece, Mrs. Meyers, living some distance away; and Mabel, with the knowledge and apparent consent of her mother, asked defendant, who had a team and wagon, to take the fruit to the Meyers home. This he consented to do; and, when he drove to the house for that purpose, Mabel says she asked or volunteered to go along. This, she says, was for the purpose of visiting her niece. No objection is shown to have been made by the mother. Defendant and Mabel did not complete the trip that night, but stopped at the home of one Brooks, where they remained until the following day, and then proceeded to the Meyers place. On the same day, or the next day, they started on their return to Logan. That night, they camped by the roadside, and there, she says, an act of intercourse took place from which she became pregnant, and in due time gave birth to a child. The defendant did not testify. As we have already said, the sufficiency of the evidence to prove the fact of intercourse is, in our judgment, not open to question.

In support of the theory of Mabel's imbecility of mind, the State relies solely upon the story which she herself tells, aided, to some extent, by that of her mother and the testimony of one physician.

Turning now to Mabel's own statement, it must be said that it is clear, consistent, coherent, and convincing, and is not in the least suggestive of mental incapacity. It is, perhaps, to be said that she does not show that degree of compunction or shame which might be expected in some girls or women under the circumstances; but, on the other hand, there is nothing in her words or conduct to suggest that she is a wanton, or is in any sense hardened in vice. It is easy to read between the lines of her story that, during

the period between their first meeting and the act of inter-course which she admits, she had acquired a feeling of af-fection for the defendant, and believed that he would marry her, and still believes he would have done so, but for the interference of others; and if, swayed by that affection and influenced by that belief, she has come to feel that her sin was not altogether unpardonable, and ought to find some degree of palliation in the minds of others, her thought is by no means unparalleled in the hearts of many unfortunate girls as to whose normal mentality no question has been raised.

Until 17 years of age, she attended a country school, where she says she went as far in her books as the course of studies in such schools permitted. Thereafter, she took a correspondence school course in bookkeeping, and received a certificate of graduation. Letters written by her to the defendant are in evidence. Barring a grammatical slip or two, they are well written, well composed, and are in all respects fully up to what one could reasonably expect in letters from a young woman of ordinary good sense and ordinary common school education, addressed to a man with whom she was in love. They contain nothing of im-modest or questionable character.

She has been in the habit of attending church and Sunday school, and has served as the school's librarian. She says that, in her earlier young womanhood, she went out, more or less, with people, boys and girls, but of recent years, defendant has been the only man paying her par-ticular attention; and that, aside from her one act with him, her conduct has been uniformly chaste; and of this there is no dispute. She has worked for other people, and at different times her mother has left her in sole charge of the home for considerable periods.

Referring to her conduct with defendant, she frank-ly says:

"I knew what the act was; knew if people found it out, they would talk about me; knew I might have a child as a result of the intercourse. He said he would take care of me. I knew it was wrong, and had full realization of my responsibility, and knew that people would judge me harshly if they found it out."

Without pursuing her statements further, we have no hesitation in saying that the sad story of this young woman's fall differs in no essential particular from the stories of thousands of others, who, in a moment of temptation, have allowed the lure of affection and passion to overcome the restraint of conscience and judgment, to their lifelong sorrow. The testimony of the mother on the subject of her daughter's mental capacity does not rise to the dignity of evidence. She does not even express the opinion that Mabel is of weak mind, nor state any single fact having any fair tendency to show such condition. Says Mabel does not "take hold of the work and go ahead like other girls. Don't have much to say." Referring, apparently, to the time of the girl's pregnancy, she says:

"She never seemed to realize the condition or anything about it. I talked to her about it, and she denied it."

It appears incidentally in the record that a party of three physicians visited the young woman, with the apparent purpose of qualifying as witnesses for the State upon the subject of her mental condition. Of these, only Dr. Kennedy was called to testify. He expresses the opinion that her condition is one of "congenital feeble-mindedness. Her will power is very low. She is below the average girl in mentality;" and, in answer to a hypothetical question, he further said she "would not have the power to distinguish between right and wrong that a girl of average mentality would have." No other evidence was offered by the State on this subject.

On the part of defendant, there were examined upon this subject seventeen different witnesses. This number includes three physicians, the young woman's brother, her sister-in-law, her niece, and a minister who had known her from childhood, and had been her schoolmate and classmate. The other witnesses were all neighbors and acquaintances, who had known her well for years; and several who had known her during all her life. Without exception, these witnesses, all of whom appear to be intelligent and candid, unite in saying that they never discovered in her any indication of feeble-mindedness or imbecility. Her older brother, who is a married man, with a family of his own, says:

"I never noticed anything peculiar about my sister's mentality at any time during her life. She was just a fair, average country girl. She seemed like any other girl, so far as I could see. I do not know of anything in her mental make-up that would lead me to believe she had no power of resistance to an application for sexual intercourse."

The brother's wife testifies she has known Mabel six years, and that Mabel had lived with and worked for her during a considerable period, and cared for her during a period of confinement.

She says:

"She did the ordinary house work, went ahead and did it as well as I could do it. I did not notice any particular difference between her and any other girl of like age."

Her niece, who was a pupil in school with her, says:

"Mabel had no trouble in her classes. She was generally ahead in them. I never noticed any indication of mental weakness."

The minister above mentioned, who was a near neighbor in their younger days, a fellow pupil until she was about 18 years of age, and later a preacher at the local church, testified:

"I would say that, when she was 18 years old, she was mentally normal, considering her surroundings and environment. I would say she was neither imbecile nor feeble-minded,—just the average country girl. From my talk with her, and the observation I have had of her since this trial began, I should say she is still normal mentally."

Several other witnesses use very similar language, saying that they have never observed anything in her to indicate mental deficiency, and speak of her as an average country girl, neither idiotic, imbecile, nor feeble-minded.

The three physicians mentioned had recently met the young woman, and made a brief examination of her to test her mental capacity. They, or some of them, were also present at the trial, and observed her appearance and testimony on the stand. Dr. C. E. Cutler, a veteran in the practice, says:

"From the observation I made of her on the witness stand, and from the examination I conducted with reference to her mental capacity, I would say she is normal. I did not find anything that would indicate such imbecility of mind as to render her unable to make effectual resistance to an application for sexual intercourse."

In this, the witness is corroborated by the younger Dr. Cutler. To the same effect is the statement of Dr. Flothow, who says, after making an examination:

"In my examination, I found no deficient nerve centers. I would say she is not an imbecile; she is quite an average woman,—that is, of average mentality. She was quite intelligent in her answers; seemed to understand the questions as I put them to her."

The foregoing is, in substance, the whole case, so far as the mental condition of Mabel Palmer is concerned, and it is indeed difficult to understand upon what theory of the facts so presented a conclusion could be reached that she is an imbecile, in any sense of the word. Were the

question one to be settled upon the expert testimony alone, it might, perhaps, be said that the jury could rightfully accept the theory of Dr. Kennedy in preference to that of the other physicians; but even if we were to entirely disregard the testimony of all the medical witnesses for the defense, we should still be compelled to say that when, to the presumption of normality, we add the united testimony of all the many witnesses who speak of Mabel Palmer from long association, observation, and intimate acquaintance, not excepting the testimony of her mother and other family relatives, the expert opinion of Dr. Kennedy is, as a matter of law, wholly insufficient to justify a finding beyond reasonable doubt that she is a person of such imbecility of mind as to prevent her making effectual resistance to the sexual advances of the defendant.

The witnesses appear exceptionally free from any bias or prejudice against this woman. Without exception, they speak of her kindly. No assault is made upon her general character. Nor does it appear that they have any special interest in shielding the defendant from the consequences of his act; and their expressed opinions are so completely sustained by Mabel's own testimony, as reflected in the record, that we think we should be derelict in our duty as an appellate tribunal, were we to permit the verdict and judgment to have our approval.

The two precedents in which we have sustained convictions under this statute, and to which we are cited by the State, are quite without application here. In *State v. Enright,* 90 Iowa 520, while there was much testimony tending to show that the girl was of normal mentality, yet it appeared that she was but 14 years old, and the court, speaking of her testimony on the trial, says:

"Her answers to questions show that she is almost an imbecile, unless she was feigning imbecility. The learned judge and the jury who tried the case saw and heard her

while she was on the witness stand, and we cannot put ourselves in the place of the judge and jury. Her appearance and demeanor while testifying were most important considerations in determining her mental capacity, and, under the circumstances, we think it is not proper for this court to interfere with the verdict. Another consideration which, no doubt, had its influence with the court and jury was that the complainant was a mere child when this calamity came upon her. She was but little past the 'age of consent.' If she had been under the age of 13 years, mere carnal knowledge would have constituted the crime of rape, without any evidence of mental weakness or imbecility."

In the case now before us, the woman was 31 years of age, and, so far from exhibiting any evidence of mental imbecility in her testimony, the whole force and effect of her story is to support the legal presumption that she is a person of normal mentality.

The other precedent, *State v. Johnson,* (Iowa) 136 N. W. 928 (not officially reported), is even less in point. The opinion there makes no statement whatever of the facts, but simply says that, from the reading of the transcript of the examination of the injured party as a witness, "our impressions are confirmatory of the finding of the jury on the question of imbecility," a remark which indicates the wide difference between the record there considered and the one which is now before us.

It is true, as intimated in the cited precedents, and as argued on the part of the State, that this court will not overlook the fact that the trial judge and jury have an opportunity to observe the demeanor and appearance of the complaining witness and other witnesses; and, in so far at least as relates to questions of veracity and of the weight to be accorded to the evidence of pertinent facts, we are ordinarily disposed

5. APPEAL AND ERROR: review: questions of fact, verdicts, and findings: substantial support necessary.

to sustain their findings. But there must be some evidence in the record which, if true, will afford substantial support for such findings, and its absence cannot be cured by assuming that the court and jury may have seen something in the conduct or demeanor of the parties or witnesses which must have led to the verdict or ruling to which exception is taken.

We have no occasion to say or suggest anything in mitigation of the offense of the defendant, if the story told by the young woman is true. Such an act of betrayal is without excuse or defense; and, had his indictment and conviction been had upon a charge of seduction, it would have been easily sustainable upon the record. Of the crime for which the State chose to prosecute him, 6. CRIMINAL LAW: nature and elements of crime: rape: "imbecility of mind:" proof beyond reasonable doubt. the alleged mental imbecility of the woman was an essential element, and defendant has the right to insist that the fact of such imbecility be established beyond a reasonable doubt. Lacking this, his conviction cannot be upheld.

For the reasons stated, the judgment of the district court is reversed, and cause remanded for further proceedings not inconsistent with this opinion.—*Reversed and remanded.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.