Argued and submitted March 8, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings September 1, 2005

STATE OF OREGON,
*Respondent on Review,*

*v.*

DONALD RICHARD REED,
*Petitioner on Review.*

(CC 010533744; CA A117819; SC S51670)

118 P3d 791

Shawn Evans Wiley, Deputy Pubic Defender, Salem, argued the cause for petitioner on review. With him on the briefs were Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, and Susan F. Drake, Deputy Public Defender, Office of Public Defense Services.

Steven R. Powers, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

DE MUNIZ, J.

Kistler, J., dissented and filed an opinion, in which Balmer J., joined.

**DE MUNIZ, J.**

The issue in this criminal case is whether the state introduced evidence sufficient at trial to establish that defendant had engaged in prohibited sexual activity because the victim had been "incapable of consenting" to certain sexual acts by reason of mental defect under ORS 163.427(1)(a)(C) (first-degree sexual abuse), ORS 163.411(1)(c) (first-degree unlawful sexual penetration), ORS 163.375(1)(d) (first-degree rape), and ORS 163.315(1)(b) ("incapacity" statute). At trial, defendant moved for a judgment of acquittal with respect to the foregoing offenses, asserting that the state's evidence was insufficient in that regard. The trial court denied defendant's motion, and a jury thereafter found defendant guilty. Defendant appealed, and the Court of Appeals affirmed without opinion. *State v. Reed*, 191 Or App 654, 84 P3d 1133 (2004). We allowed defendant's petition for review and now reverse.

A 13-count indictment charged defendant with various sex crimes against his daughter, including first-degree sexual abuse, ORS 163.427(1),[1] first-degree unlawful sexual penetration, ORS 163.411(1),[2] first-degree attempted rape, ORS 163.375(1),[3] and attempted incest, ORS

---

[1] ORS 163.427(1) provides:

"A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and:

"(A) The victim is less than 14 years of age;

"(B) The victim is subjected to forcible compulsion by the actor; or

"(C) The victim is incapable of consent by reason of being mentally defective, mentally incapacitated or physically helpless[.]"

[2] ORS 163.411(1) provides:

"Except as permitted under ORS 163.412, a person commits the crime of unlawful sexual penetration in the first degree if the person penetrates the vagina, anus or penis of another with any object other than the penis or mouth of the actor and:

"(a) The victim is subjected to forcible compulsion;

"(b) The victim is under 12 years of age; or

"(c) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

[3] ORS 163.375(1) provides:

"A person who has sexual intercourse with another person commits the crime of rape in the first degree if:

163.525(1).[4] For each factual episode of alleged sexual abuse, sexual penetration, and attempted rape, the state charged in one count that defendant had committed the crime "by means of forcible compulsion" and, in another count, that he had committed the crime with "a person being incapable of consent by reason of mental defect."

At trial, the victim testified regarding all three incidents of sexual activity with defendant. A psychologist, Dr. Colistro, also testified for the state respecting the victim's mental capacity, concluding that she suffered from "mild mental retardation."[5]

Defendant moved for a judgment of acquittal on all the charges.[6] With regard to the charges alleging that the victim had been incapable of consent by reason of mental defect, defendant specifically argued that the state had failed to prove that the victim had been incapable of consent by reason of mental defect. The trial court rejected defendant's motion for judgment of acquittal in its entirety. A jury acquitted defendant of the counts based on forcible compulsion but convicted defendant of the counts based on the victim's alleged inability to consent to the sexual contact.[7] Defendant

---

"(a) The victim is subjected to forcible compulsion by the person;

"(b) The victim is under 12 years of age;

"(c) The victim is under 16 years of age and is the person's sibling, of the whole or half blood, the person's child or the person's spouse's child; or

"(d) The victim is incapable of consent by reason of mental defect, mental incapacitation or physical helplessness."

[4] ORS 163.525(1) provides:

"A person commits the crime of incest if the person marries or engages in sexual intercourse or deviate sexual intercourse with a person whom the person knows to be related to the person, either legitimately or illegitimately, as an ancestor, descendant or brother or sister of either the whole or half blood."

Incest is a Class C felony. ORS 163.525(2). Attempted incest is a Class A misdemeanor. ORS 161.405(2)(d).

[5] We discuss the testimony of the victim and Colistro in greater detail later in this opinion.

[6] Apparently, for the trial judge's convenience, defense counsel moved for judgment of acquittal on all the charges before the state had completed putting on its evidence. The trial court heard argument at that time and made its ruling on the motion after the defense had completed its evidence.

[7] The jury also convicted defendant of attempted incest. Defendant has not challenged that conviction at any stage of his appeal.

appealed to the Court of Appeals, arguing that the trial court should have granted his motion for judgment of acquittal on the counts alleging that the victim had been incapable of consent by reason of mental defect. As noted, the Court of Appeals affirmed without opinion, *Reed*, 191 Or App 654, and we allowed review.

■        In reviewing a trial court's order denying a motion for judgment of acquittal, this court views the evidence in the light most favorable to the state to determine whether a rational factfinder could have found the elements of the crimes in question beyond a reasonable doubt. *State v. Lotches*, 331 Or 455, 498, 17 P3d 1045 (2000).[8]

■        As noted above, the thrust of defendant's argument is that the state's evidence at trial was insufficient to prove that the victim had been incapable of consent by reason of mental defect with regard to the various sex crimes for which defendant ultimately was convicted.[9] Our inquiry, then, must begin with the intended meaning of that element. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993) (setting out statutory construction methodology in such cases). Two statutes, ORS 163.315(1)(b) and ORS 163.305(3), are pertinent to our inquiry in that regard. ORS 163.315(1) provides, in part:

> "A person is considered incapable of consenting to a sexual act if the person is:
>
> "* * * * *
>
> "(b)   Mentally defective[.]"

ORS 163.305(3) provides that, for purposes of the sex crimes at issue in this case:

---

[8] The state argues that defendant failed to preserve his argument that the trial court erred in denying the motion for judgment of acquittal. *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (explaining preservation requirement). Although defendant has emphasized different aspects of the trial court's alleged error at different times, *e.g.*, whether it erred in its treatment of the expert testimony or specific evidence of lack of consent, defendant consistently has asserted the state's failure to introduce evidence sufficient to support a jury verdict. We conclude that defendant properly preserved the issue.

[9] We note that, with regard to the crimes at issue, the jury was instructed in accordance with the statutory elements and that defendant does not challenge any aspect of those instructions.

> " 'Mentally defective' means that a person suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person."

ORS 163.305(3) defines "mentally defective" in terms of a "mental disease or defect" but requires that the mental disease or defect be one that renders the person "incapable" of "appraising the nature of the conduct of the person." The key words of that statute are "incapable," "appraising," "nature," and "conduct." "Incapable" means "lacking capacity, ability, * * * qualification for the purpose or end in view[;] * * * lacking legal qualification or power esp. because of some fundamental legal disqualification[;] lacking the personal ability, * * * or understanding required in some legal matter[.]" *Webster's Third New Int'l Dictionary* 1141 (unabridged ed 2002). "Appraise" means "to judge and analyze the worth, significance or status of[.]" *Id.* at 105. "Nature" means "the essential character or constitution of something[.]" *Id.* at 1507. "Conduct" means "a mode or standard of personal behavior esp. as based on moral principles[.]" *Id.* at 473. *See generally PGE,* 317 Or at 611 (in statutory construction, words of common usage ordinarily given their common meanings).

Applying all the foregoing definitions, we conclude that ORS 163.305(3) refers to a mental defect that prevents one from appraising the nature of one's own conduct. The "appraisal" must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct. Further, in circumstances such as those presented in this case, we view that standard in the context of interactions with other persons, such as offers and proposals from other persons to engage in certain kinds of conduct.

It is also necessary to point out that the statutory definition of mentally defective does not support the notion that a person who has a mental disability is necessarily incapable of consenting to sexual relations under any circumstances. Rather, a person who can understand that another person has initiated some kind of sexual activity with that person may be capable of appraising the nature of the conduct and, thus, may be capable of consenting to a sexual act for purposes of the statutory provisions at issue here.

Having clarified the statutory requirements, we turn to a review of the evidence presented at trial. The victim testified as to three incidents of sexual activity with defendant. During the first incident, defendant unbuckled the victim's belt and put his hands down her pants and under her shirt. The victim testified that she told defendant that she did not want to be touched. The victim resisted, but defendant was able to overcome her resistance.

During the second incident, defendant and the victim were in a vehicle when defendant unbuttoned the victim's blouse and touched her breast. The victim testified that she told defendant, "Get your hands out of there. I don't want[.]" According to the victim, defendant then used a seatbelt in some fashion to restrain her and overcome her resistance.

During the third incident, defendant came up behind the victim while she was seated on a couch in defendant's home. The victim testified that "[h]e started getting fresh with me, started (inaudible) me, touching my (inaudible)[,] touch[ing] me on the back." According to the victim, defendant told her that they were in his house and that he could do what he wanted; he then pulled her pants down. The victim testified that she defended herself and pushed defendant off the couch, and also told him that she wanted to leave and that "I'm not the type of girl to do that."

The victim's own testimony indicated that she had the capacity to consent and to understand that having sexual relations with defendant was wrong, and that to understand what defendant was attempting was not something that she wanted to do. The jury, however, was free to reject her testimony and to rely on other testimony and evidence relevant to its determination whether the victim's mental defect had rendered her incapable of consenting to sexual contact. On the other hand, disbelieving the victim or discounting her testimony on that point does not add anything affirmative to the state's evidence.

As explained, however, the state was required to produce affirmative evidence that, at the time of the alleged crimes, the victim had a mental defect and that that mental defect had rendered her incapable of consent. On this record,

the necessary link between the victim's mental condition and her incapacity to consent to sexual contact must be found—if it is to be found at all—in the testimony of Colistro, which we discuss below.

Colistro testified that he had tested the victim's IQ on several occasions, concluding that "[h]er scores placed her in the mild to moderate mental retardation range." He provided the following general summary of her social functioning ability:

"She's a very dependent person. She's still living at home. She's still dependent upon her mother for guidance and support.

"Over the years, according to what she tells me and what her mother told me, she was provided with opportunities to advance herself, such as placement in sheltered workshop settings with agencies like Goodwill and the Salvation Army. In those situations, or at least in the situation she was placed, she functioned for a matter of weeks before she was let go because she simply couldn't operate, even in that sheltered setting, anything approaching a reasonable level of productivity.

"Since then her scope of functioning socially has been pretty much what you would get with a preadolescent. She stays home. She interacts with her mother, she interacts with her siblings, she interacts with a few people who are close friends of the family, and that's about it in terms of her functioning adequately."

Colistro continued his summary description of the victim's mental deficiency:

"She suffers from mild mental retardation. * * * [T]his is an individual, again, whose intellectual functioning, when you compare her to the population in general, is at or below the first percent. It tells me that she's unable to work in any capacity because of how low her intellectual capabilities are. Even in a sheltered workshop capacity, she's so impaired that she can't function.

"The [IQ] scores are consistent with the information I received from her and her mother, which indicates that basically, even though she's in her thirties, she still has to live [at] home with her mother. She needs somebody, another adult who can direct her and care for her to assure

her safety in all domains, particular with regard to social functioning. That's because a component of this level of mental retardation is dependency and passivity. People at this level are easily victimized. That's why people at this level typically have to have a payee for their disability benefits. Typically, they'll give their money away if somebody doesn't prevent them from doing that. That kind of level of ongoing intensive supervision is necessary in all life domains to make sure that they take adequate care of themselves and to stay out of harm's way."

On this record, we conclude that the state's evidence did not support the trial court's decision to deny defendant's motion for a judgment of acquittal. Colistro never was asked directly whether the victim's mental condition rendered her incapable of consenting to sexual contact. Colistro's testimony did not address either directly or inferentially the element of "incapable of consent" due to "mental defect" in the sex crimes at issue, as we have construed that element in this opinion. Indeed, at oral argument in this court, the state conceded that it had offered no direct evidence at trial regarding how the victim's mental capacity had affected her ability to appraise the nature of the sexual conduct that defendant had initiated. As noted, Colistro testified that the victim was not socially independent in her daily affairs and had difficulty maintaining a job. Although that testimony might have had some bearing on the victim's qualifications to manage money or to participate in the work force, it failed to describe, either directly or by permissible inference, her ability to understand and to consent to sexual relations. Similarly, Colistro's description of the victim's scores on various psychological tests of her intelligence did not either directly or by permissible inference describe her understanding of sexual relations or her ability to make choices about having sexual relations with others.

In sum, we conclude that the state failed to introduce sufficient evidence at trial to permit a rational juror to conclude that the victim was incapable of consent by reason of mental defect. The trial court erred as a matter of law in denying defendant's motion for judgment of acquittal on that ground.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**KISTLER, J.,** dissenting.

The jury found that defendant had sexually abused, unlawfully sexually penetrated, and attempted to rape his 35-year-old, developmentally delayed daughter. Although the jury found that defendant had not forcibly compelled his daughter to engage in those acts, it also found that his daughter was incapable of consenting to those acts by reason of a mental defect. The majority holds that no reasonable juror could find that the daughter lacked the capacity to consent. Because, in my view, there was circumstantial evidence from which a reasonable juror could draw that inference, I respectfully dissent.

A person commits the crime of first-degree sexual abuse, unlawful sexual penetration, and attempted first-degree rape if that person engages in certain sexual acts with a person who is "incapable of consent by reason of mental defect." *See* ORS 163.427(1)(a)(C) (first-degree sex abuse); ORS 163.411(1)(c) (unlawful sexual penetration); ORS 163.375(1)(d) (first-degree rape). The question whether a person is "incapable of consent by reason of mental defect" turns on whether that person "suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person." ORS 163.305(3). There is no dispute that a reasonable juror could find that the victim in this case suffered from a "mental defect." A psychologist who had tested the victim testified that she was developmentally delayed, and the record provided additional evidence of her limited intellectual and emotional development.

The question is whether a reasonable juror also could find that her condition rendered her "incapable of appraising the nature of [her] conduct." As the majority recognizes, that question entails two issues. The first is what the phrase "incapable of appraising the nature of the conduct" means. On that issue, I agree with the majority that the word "appraising" is key to understanding the meaning of the quoted phrase. As the majority notes, the word "appraise"

means "to judge and analyze the worth, significance or status of." *Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002). Thus, the question whether a person lacks the capacity to consent by reason of mental defect turns on whether the person is capable of judging or analyzing the worth, significance, or socially accepted status of engaging in particular sexual activity. Put another way, the question is whether the person is capable of assessing the personal and social consequences of his or her decision to engage in that activity.[1]

The issue that remains, however, and the issue on which I part company with the majority, is whether the record permitted a reasonable juror to find that the victim lacked that capacity. On that issue, Dr. Colistro, a psychologist, testified that he had tested the victim's intellectual ability twice, once when she was 14 and again when she was 35. The first time that he tested the victim, her scores put her intellectual ability "beneath the first percentile, which means that less than one percent of the overall population scores lower than you." The second time that he tested the victim, shortly after her mother reported the sexual abuse, her overall score had risen slightly but was still "so low that it falls at the first percentile." Based on those scores, Colistro diagnosed the victim's present condition as mild retardation.

Colistro explained that a person's score on an intelligence test does not necessarily measure how well that person can function socially. Other factors come into play.[2] Colistro testified that he, and others, divide a person's deficiencies in social functioning into three categories—mild,

---

[1] The legislative history supports that textual interpretation. In defining the standard set out in ORS 163.305(3), the drafters of Oregon's criminal code followed the holding from an Iowa case that a person is incapable of consent by reason of mental defect or disease if he or she lacks the "mental capacity to know the right or wrong of sexual conduct." *See* Commentary to the Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 105 (July 1970) (explaining holding in *State v. Haner*, 186 Iowa 1259, 173 NW 225 (1919)).

[2] In evaluating whether a person is deficient in his or her ability to function socially, Colistro considered whether the person:

"because of his [or her] condition, has trouble getting along with others, interacting with others, experiences substantial anxiety when they're around people who aren't familiar to them, they ask us to look at a person's ability to be responsive to directions, to learn from their environment, to work under pressure or function under pressure without having the condition basically kind of take over the situation and cause them to fail."

moderate, and marked. He categorized the victim's deficiencies in social functioning as "marked," and those deficiencies were in addition to her diminished intellectual capacity. Finally, the victim's mother explained that her daughter has difficulty speaking and hearing.

Colistro's observations of the victim and the information that he learned from the victim's mother were consistent with his diagnosis. He explained that the victim is "a very dependent person," that she lives at home, that she is unable to hold a job even in sheltered settings such as Goodwill and the Salvation Army, that she is not able to handle her own money, that she depends on her mother for "support and guidance," and that she functions socially at the level of a preadolescent. For example, when asked what she likes to read, the victim answered, *"Snow White."* Colistro concluded that the victim "needs somebody, another adult who can direct her and care for her to assure her safety in all domains, particularly with regard to social functioning."

As the majority notes, the victim testified that defendant had engaged in sexual contact with her on three occasions. The first time, the victim and defendant were "[p]icking rocks" (apparently looking for agates) under a bridge. Defendant came over and sat behind his daughter on a "big rock." She testified,

> "[H]e start putting—he was putting—touched me, and I told him no. I said no, (inaudible). 'I don't like to be touched.' And he started to unbuckle my belt (inaudible), unbuckled my belt."

Defendant continued until he touched and then penetrated his daughter's vagina with his hand.

The second time, defendant and his daughter were parked near the airport in his minivan "watching the planes go in and out." According to his daughter, defendant touched her twice that day. He "started with [her] shirt and (inaudible) [her] shirt and under [her] blouse and touched [her] breast." She told him, "Get your hands out of there. I don't want (inaudible)." Later, when he did the same thing again, she said, "Let go of me. You're hurting me. Let go." Defendant, however, did not let go.

The third time, the victim went over to defendant's house to watch television. She was bending over on the couch looking at the birds out the window, when defendant came up behind her and started undoing her pants. The victim told defendant, "Let go. Don't touch," but he continued to pull her pants down. Eventually, defendant stopped before engaging in sexual intercourse with his daughter. After explaining that she had told defendant that she had wanted to leave, the victim said, "I'm not that type of girl to do that."

Defendant argues that the victim's repeated refusals to engage in sexual activity demonstrated that she was capable of assessing the personal and social consequences of agreeing to his advances. Although the jury could have drawn that inference, it reasonably could have drawn the contrary inference. The jury could have inferred that the phrases that the victim used, "Let go," "Don't touch," and "You're hurting me," suggested a more visceral reaction to an unexpected and unpleasant physical experience—an experience made all the more unsettling by its source. The fact that a 12-year-old child—that is, a person who functioned at the same level as the victim, according to Colistro—says, "Don't touch" or "Stop," does not imply that the child has the capability to assess the personal and social consequences of engaging in sexual activity. The jury reasonably could have drawn (and did draw) that conclusion here.

Not only does this record not compel the conclusion that the victim had the requisite capability to consent to defendant's advances, but it permitted a reasonable juror to conclude that she lacked that capability. As noted, the victim functions socially at the level of a preadolescent. According to the record, her favorite book is *Snow White*; she cannot manage her own money; and, according to Colistro, she needs some adult who can "direct her and care for her to assure her safety." The jury reasonably could have inferred from that testimony, as well as from the evidence of the victim's diminished mental ability, that the victim lacked the capability to weigh and assess the consequences of agreeing to engage in sexual activity. Indeed, given Colistro's testimony that the victim functioned socially at the level of a preadolescent, the jury reasonably could have inferred that, like an underage child, she lacked the capability to make judgments about the

complex personal and social issues that surround decisions regarding sexual activity. *See, e.g.*, ORS 163.375(1)(b) (victim under 12 years of age lacks capacity to consent to sexual intercourse).[3]

To be sure, the state could have introduced evidence, from Colistro or others, that directly addressed the victim's ability to assess the personal and social consequences of engaging in sexual activity. But the state also may prove its case by circumstantial evidence, *State v. Rose*, 311 Or 274, 281, 810 P2d 839 (1991), and the circumstantial evidence in this case permitted a reasonable juror to find that the victim was not capable of consenting by reason of mental defect. Because I would affirm the trial court's judgment, I respectfully dissent.

Balmer, J., joins in this dissent.

---

[3] The jury reasonably could have drawn a different inference, but the task of sorting and weighing the evidence is for the jury. *See State v. King*, 307 Or 332, 339, 768 P2d 391 (1989) (stating that proposition).