No. 198 March 12, 2025 531

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CESAR LUJANO-ROSALES,
*Defendant-Appellant.*

Washington County Circuit Court
20CR31322; A175964

Andrew Erwin, Judge.

Argued and submitted February 27, 2023.

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Christopher A. Perdue, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Powers, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Defendant appeals from a judgment convicting him of two counts of first-degree sodomy and one count of first-degree sexual abuse. The state alleged that the victim, EH, was legally "incapable of consent by reason of mental defect," ORS 163.405(1)(d) (2019) (sodomy in the first degree), and "incapable of consent by reason of being mentally defective," ORS 163.427(1)(a)(C) (2019) (sexual abuse in the first degree), meaning that the victim "suffers from a qualifying mental disorder that renders the person incapable of appraising the nature of the [person's] conduct," ORS 163.305(2) (2019).[1] In his first four assignments of error, defendant challenges the trial court's exclusion, under OEC 412, of proffered evidence found on EH's cell phone. In his fifth assignment of error, defendant argues that the trial court erred in denying his motion for judgment of acquittal on all counts because, in his view, no reasonable factfinder could find that EH's intellectual disability rendered him incapable of appraising the nature of his conduct.

We conclude that there is some basis for a rational trier of fact to conclude that EH's intellectual disability rendered him incapable of exercising judgment as to the significance of his conduct—specifically, that EH's intellectual disability rendered him incapable of understanding that he was paying for sex, which is a crime, and, consequently, that he could not exercise his judgment with regard to engaging in that conduct. The trial court therefore correctly denied defendant's motion for judgment of acquittal. We further conclude that any error in excluding the proffered cell phone evidence was harmless. We therefore affirm.

## MOTION FOR JUDGMENT OF ACQUITTAL

We review a trial court's denial of a motion for judgment of acquittal (MJOA) to determine whether, viewing

---

[1] In 2020, when the charged offenses in this case occurred, a person was "considered incapable of consenting to a sexual act" if the person was "[m]entally defective," ORS 163.315(1)(b) (2019). The legislature has since amended those statutes, and others, to eliminate all references to "mental defect" or "mentally defective." Or Laws 2017, ch 364, §§ 2-17, 19-28; Or Laws 2021, ch 82, §§ 1-9. Under current law, "[a] person is considered incapable of consenting to a sexual act if the person is *** [i]ncapable of appraising the nature of the person's conduct." ORS 163.315(1)(b); *see also* ORS 163.315(3) (setting forth the circumstances in which a person is "incapable of appraising the nature of the person's conduct").

the evidence in the light most favorable to the state and accepting reasonable inferences and credibility determinations, a rational factfinder could have found the elements of the crime beyond a reasonable doubt. *State v. Edwards*, 337 Or App 196, 197, 562 P3d 1114 (2025). We state the relevant facts accordingly.

EH, who was 17 years old at the time of the charged offenses, has an intellectual disability. His IQ is 56, and his verbal comprehension, problem-solving ability, short-term memory, and ability to process information are extremely low.

According to special education staff at EH's high school, EH's inability to understand verbal prompting can interfere with his ability to comprehend what someone is saying; he responds agreeably or says "yeah" as a coping mechanism when he is confused or has difficulty processing. EH's processing disorder also means that some concepts need to be reintroduced over and over again. Although EH's verbal communication is on par with his peers, he misunderstands nonverbal cues and gestures and sometimes mimics inappropriate behaviors. EH has difficulty conceptualizing that peers are "taking advantage of him." For example, EH continues to purchase snacks for peers despite their lack of reciprocation and does not understand when peers are laughing *at* him rather than *with* him. EH can be hyperactive and impulsive due to his intellectual disability and diagnosed ADHD and has difficulty determining safety risks, which renders him vulnerable to strangers.

EH lives with his mother and younger sister in an apartment in Beaverton. According to his mother, EH manages his basic hygiene with reminders but does not cook for himself. EH cannot tie his shoes and does not know his left from his right. He believes that "everybody's his friend" and that nobody is a bad person. EH does not drive and has learned to take some public transportation but initially did not understand that he needed to pay a fare. EH does not have a job and earns money by collecting cans. EH earned a B grade in a high school health class with the general education population, and his special education teacher taught his class about sex, which included instruction about asking for permission for "physical touching and mental touching,"

which EH said was "[f]or like, the consent or whatever." But when EH was asked what "physical touch" means, he said that he did not know.

EH first met defendant in early May 2020 outside defendant's apartment complex, which is near EH's apartment complex, when EH was collecting cans with a friend. Defendant called himself "Taylor" and "looked like a girl" to EH because he was wearing a dress and a wig.[2] EH wanted defendant to be his friend, so he told his friend to leave so he could talk to defendant in defendant's apartment alone. They talked for approximately 20 minutes about EH helping defendant get money and groceries, and they exchanged phone numbers. EH and defendant then began communicating by text message.

In those text exchanges, EH told defendant that he was 25 years old, repeatedly referred to defendant as "baby girl" and "babe," and asked if defendant had a boyfriend and if EH could come over and spend the night. At some point, EH sent defendant a photo of EH's penis. Defendant consistently responded by offering to engage in sexual contact with EH on the condition that EH pay for defendant's groceries and cell phone. EH initially refused, then agreed to "help" defendant the next week, and then suggested that defendant ask a friend for the money. When defendant threatened to end the conversation and to find another "daddy love," EH replied, "Have fun without my dick," "Okay because I had the money so bye," and "I hope you find a new guy that can try to fuck you." When EH reinitiated the text conversation a week later, defendant again asked for money. EH said no, that he had no money, and "Just ask your sister right now." Defendant responded, "Text me when u ready help me good and when u horny." EH then asked if defendant would come over for EH's birthday, and defendant responded, "[O]nly host when u help me to pay my groceries shopping and pay my cellphone." EH later replied, "I thought your sister was going to give you money."

---

[2] It is unclear from the record what pronouns defendant prefers. The record shows EH using male and female pronouns interchangeably to refer to defendant. Because defendant's counsel consistently used male pronouns to refer to defendant at trial, we do the same herein, including, to avoid confusion, when describing EH's statements.

EH acknowledged texting defendant, as well as several other people, about "hooking up," which EH understood to mean "meeting each other, probably having sex and stuff like that." EH also acknowledged that he told defendant and others that he was older than he was, because he thought they might not want to hook up with him if they knew he was 17, and that he continued to text defendant and others in private, even after his mother and a friend had told him to stop and that they did not approve of it.

On the day of the charged incident in early June 2020, EH's mother had been released from the hospital after being treated for an allergic reaction and was sedated from medication. EH knew that she was "drugged up" and asleep in her bedroom. EH texted defendant, and they met up outside defendant's apartment. Defendant was again wearing a wig and a dress. EH gave defendant cash that he had withdrawn from a nearby ATM using his mother's debit card. They walked to EH's apartment, and EH suggested that they go in through the window instead of the front door because EH did not want his mother to know that defendant was coming to the house.

EH and defendant climbed through a window into his sister's room. EH "locked the door so no one would come in, and [they] had sex." Before they had sex, there was no express discussion of what they were going to do; they "just did it." When they took off their clothes, EH was "[a] little bit" confused "[t]o see if [defendant] was, like, a boy or a girl" and, upon seeing defendant's penis, was unsure whether the sex was "like, gay or not really." But EH proceeded to have sex with defendant, with defendant briefly performing oral sex on EH, and EH then performing anal sex on defendant.

After approximately 10 minutes, EH told defendant he wanted to stop because he could hear his mother and her friend Lamont talking in the living room, which made him feel uncomfortable and scared. Defendant did not evince a response, so EH just put his clothes back on and left out the window. Defendant followed, and they went around through the front door to introduce defendant to EH's mother and Lamont, who quickly took defendant outside and told him to leave. EH admitted to Lamont that he had engaged in

sexual contact with defendant and had given defendant money.

Defendant waived his right to a jury trial. At the close of the state's evidence, defendant presented a combined motion for judgment of acquittal and closing argument to the trial court. Defendant did not dispute that EH has a qualifying mental disorder, but he argued that the evidence was insufficient to prove a lack of capacity, where EH affirmatively sought out sexual contact, expressed his intent to have a sexual relationship with defendant, and orchestrated the sexual encounter with defendant."[3]

The state responded that "the particular sexual conduct in this case was [EH] being misled for a month of his life about who and what the defendant was, believing that this was a person he had feelings for who might become his girlfriend, that the defendant disguised himself, gave off a fake name, went in through this child's window, never asked him about sexual conduct, let alone the types of conduct they engaged in, refused to listen when [EH] said no, refused to listen when [EH] said leave" and that EH "was in a confusing situation that he did not comprehend when that sexual encounter went on."

The trial court simultaneously denied defendant's motion and found defendant guilty on all counts. In a detailed speaking verdict, the court found that EH was incapable of appraising two particular personal and social consequences of his sexual conduct with defendant—that EH was having sex with a prostitute and that EH was having sex with a man:

"THE COURT: There's no question in my mind that not only did [EH] not know that he was having sex with a prostitute, he didn't know—he never grasped, up to the point of contact, that he was engaging in sexual contact with another man. Now, once he saw [defendant's] anatomy,

---

[3] Defendant also raised an affirmative defense that he did not know that EH was intellectually disabled. *See* ORS 163.325(3) (providing for an affirmative defense to prosecution under ORS 163.355 to 163.445 "that at the time of the alleged offense the defendant did not know of the facts or conditions responsible for the victim's incapacity to consent"); ORS 161.055(2) (providing that the defendant has the burden to prove an affirmative defense by a preponderance of the evidence).

certainly that raised a flag, but it took a great deal of pro-
cessing to get to where he could finally understand that.

"But being told after the fact that you got tricked into
having that kind of sex can never and will never be consent
to have that kind of sex. And because he was never given
a chance to assess the social or personal consequences of
that particular sexual activity, he could not consent to it
because of his cognitive abilities ***.

"And so, I am convinced beyond all doubt—well, I guess
I can't really say it that way, but beyond all reasonable
doubt, the defendant is guilty of all the counts."

On appeal, defendant reprises his argument that
the record compels the conclusion that EH had the capacity
to consent as a matter of law, but defendant addresses only
the second issue identified, *i.e.*, whether the MJOA could
properly be denied based on there being evidence that EH
lacked the intellectual ability to appraise the personal and
social consequences of having sex with another man and
therefore was legally incapable of consent when he had sex
with defendant. However, for the reasons explained below,
we conclude that the evidence was legally sufficient to deny
the MJOA based on there being evidence that EH lacked the
intellectual ability to appraise the personal and social con-
sequences of paying for sex. We therefore affirm the MJOA
on that basis. In doing so, we express no opinion on the trial
court's alternative reasoning, which was introduced and
invited by the state, and nothing in this opinion should be
understood as an endorsement of that reasoning.

We begin with the relevant legal standard. In
*State v. Reed*, 339 Or 239, 118 P3d 791 (2005), the Oregon
Supreme Court construed the statutory phrase "suffers
from a [qualifying mental disorder] that renders the person
incapable of appraising the nature of the [person's] conduct."
The court explained that that means that the qualifying
mental disorder "prevents one from appraising the nature
of one's own conduct" and that the "'appraisal' must con-
stitute an exercise of judgment and the making of choices
based on an understanding of the nature of one's own con-
duct." *Id.* at 244. That standard must be viewed "in the con-
text of interactions with other persons, such as offers and

proposals from other persons to engage in certain kinds of conduct." *Id.* The court cautioned that "the statutory definition of mentally defective does not support the notion that a person who has a mental disability is *necessarily* incapable of consenting to sexual relations under any circumstances." *Id.* (emphasis added). Rather, "a person who can understand that another person has initiated some kind of sexual activity with that person *may* be capable of appraising the nature of the conduct and, thus, *may* be capable of consenting to a sexual act \* \* \*." *Id.* (emphases added).

After the parties briefed this case, the court decided *State v. Wallace*, 373 Or 122, 561 P3d 602 (2024), which reaffirmed *Reed* and further clarified the relevant inquiry. The *Wallace* court first explained what it understood *Reed* to have concluded:

> "First, to obtain a conviction for a first-degree sex offense on the theory that the alleged victim was incapable of consenting to the charged conduct, the state must produce sufficient evidence for a rational [factfinder] to find that the victim was incapable of either (1) understanding the sexual nature of that conduct; or (2) exercising judgment in choosing whether to participate in the conduct based on that understanding. Second, for purposes of the statutes in effect at the time of *Reed* and the charged acts in this case, the state must also prove that the alleged victim has a qualifying intellectual disability. And third, the evidence must support the finding that the alleged victim's incapacity either to understand the nature of the conduct or to exercise judgment and choose whether to engage in that conduct resulted from that disability."

373 Or at 136.

The court then went on to clarify that whether a person is capable of exercising judgment in choosing whether to participate in the conduct "may include an assessment of whether the person recognizes that the conduct at issue has potential personal and social consequences, but no specific understanding or consideration is determinative[.]" *Id.* at 148. Rather, "what matters is whether there is a basis for the [factfinder] to conclude that the person was incapable of exercising judgment regarding the significance of that conduct," which "is evaluated at the time of the conduct and

depends on whether the person is capable of appraising *that* conduct." *Id.* (emphasis in *Wallace*); *see also id.* at 146 ("[T]he ultimate question is whether the person is capable of taking such [potential personal and social] consequences into consideration in deciding whether to consent, and not whether the person's ultimate decision is subjectively right or wrong in anyone else's view."). Finally, the state "is not required to prove that the person's intellectual disability permanently prevents them from acquiring that capability, but only that it prevented them from appraising the nature of the conduct at issue." *Id.*

In applying that legal standard, the *Wallace* court also employed an order of operations for analyzing evidence of incapability of consent. First, a court reviews the alleged victim's testimony to determine whether it gives "some indication that [they] understood the sexual nature of the conduct that the defendant had initiated" and that they "understood that there were potential personal and social consequences of engaging in sexual conduct." *Id.* at 150. By way of example, the court contrasted the victim's testimony in *Reed* with the victim's testimony in *Wallace*: In *Reed*, the victim's statements comprised "clear descriptions of the incidents and characterizations of the defendant's actions" as sexual and indicated that she understood "that having sexual relations with the defendant was wrong and that what the defendant was attempting was 'not something that she wanted to do,'" whereas the victim's statements in *Wallace* "reflect[ed] an individual who, if she understood that the conduct at issue was sexual, *** failed to make a conscious decision whether to go along—that is, exercise judgment with regard to that conduct." *Id.* at 150-51.

The court then reviews other testimony and evidence to determine whether it "provide[s] any affirmative support for the state's case," *i.e.*, "whether it provide[s] 'affirmative evidence that, at the time of the alleged crimes, the victim had a mental [disability] and that that mental [disability] had rendered [them] incapable of consent." *Id.* at 151 (quoting *Reed*, 339 Or at 245). The court again contrasted the contextual evidence in *Reed* with the contextual evidence in *Wallace*: In *Reed*, not only had the victim's testimony not

provided any affirmative support for the state's case, but the state's expert merely "offered generalized testimony about the victim's capacity to function in other social situations, and even more generalized testimony about the social functioning capacity of similar individuals"; the state, therefore, "did not sufficiently connect that evidence of the victim's impaired social functioning to her alleged inability to appraise the nature of the conduct initiated by the defendant." *Id.* at 152 (citing *Reed*, 339 Or at 247). By contrast, in *Wallace*, "the state linked [the victim's] arguable inability to exercise judgment about [the] defendant's sexual conduct—as opposed to merely recognizing it as sexual—to the manner in which she functioned in other social situations, which undisputedly was due to her intellectual disability." *Id.* That evidence, along with "the challenges [the victim] experienced while testifying at trial," which reflected "similar difficulties processing her thoughts," and "her accounts of how she absorbed and responded to defendant's conduct" was sufficient to "support the inference that, at the time of [the] defendant's charged conduct, [the victim's] intellectual disability rendered her incapable of appraising the nature of her conduct." *Id.*

Applying that framework here, we first review EH's testimony to determine whether it gives some indication that he understood the sexual nature of his conduct with defendant and that he understood that there were potential personal and social consequences in engaging in sexual conduct. We conclude that EH's testimony is similar to the victim's testimony in *Reed* in that his statements provide clear descriptions of the incident and characterizations of his and defendant's actions as sexual and indicate that he understood that there were at least some potential personal and social consequences in engaging in sexual conduct. EH testified that he and defendant "had sex" and consistently described the particular sexual conduct he and defendant engaged in, *viz*. oral and anal sex. Further, EH's testimony describing the affirmative actions he took both to arrange the sexual encounter with defendant and to evade scrutiny from his mother indicates that he made a conscious decision to engage in sexual conduct with defendant. Like in *Reed*, EH's testimony and statements alone do not provide

affirmative support, in the form of direct evidence or permissible inferences, that he lacked capacity to appraise the nature of his conduct.

We turn to the remaining evidence to determine whether it provides affirmative evidence that, at the time of the charged conduct, EH's disability had rendered him incapable of consent—specifically, whether the state sufficiently connected the evidence of EH's impaired cognitive and social functioning to his alleged inability to appraise the nature of his conduct with defendant. We conclude that the record here is similar to the evidence in *Wallace* in that the state linked EH's arguable inability to exercise judgment about the particular sexual conduct—that he was exchanging money for sex—to the manner in which he functioned in other social situations, which undisputedly was due to his intellectual disability.

EH's verbal comprehension, problem-solving ability, short-term memory, and ability to process information are extremely low. As a result, EH fails to understand certain verbal prompts and nonverbal cues, and certain concepts must be reintroduced repeatedly. EH has particular difficulty understanding the transactional nature of social situations, as evidenced by his continued purchasing of snacks for his peers without reciprocation and his initial lack of understanding that fare is required to ride public transportation. Likewise, his text messages with defendant can be read as reflecting a lack of understanding as to the transaction that defendant was proposing, even if it would have been obvious to someone who was not intellectually disabled.

On this record, a reasonable factfinder could find that EH understood that he was giving defendant money in exchange for sex, but a reasonable factfinder also could find that EH did *not* understand that that was what was happening. Paying for sex has objective and nonspeculative personal and social consequences, in that doing so is a crime for both parties. *See* ORS 167.007 ("A person commits the crime of prostitution if the person engages in, or offers or agrees to engage in, sexual conduct or sexual contact in return for a fee."); ORS 167.008 ("A person commits the crime of commercial sexual solicitation if the person pays, or offers or agrees

to pay, a fee to engage in sexual conduct or sexual contact."). We emphasize that the relevant question "is the alleged victim's capacity to exercise judgment regarding proposed conduct, and not whether others might view the resulting decision as morally 'correct.'" *Wallace*, 373 Or at 145. Here, a reasonable factfinder could find that EH's intellectual disability rendered him incapable of understanding that he was paying for sex, which is a crime, and, consequently, that he could not exercise his judgment with regard to engaging in that conduct. We therefore conclude that, under the *Wallace* standard, as we understand it, the trial court did not err in denying defendant's motion for judgment of acquittal.

## EVIDENTIARY RULING

Defendant's first four assignments of error challenge the exclusion, under OEC 412,[4] of evidence found on EH's cell phone—specifically, EH's usage of pornographic and casual-dating websites, photos of individuals in sexually explicit positions, photos and videos of EH masturbating, and EH's contact list containing sexually suggestive names. We conclude that any error in excluding the proffered evidence was harmless.

Under Article VII (Amended), section 3, of the Oregon Constitution, we must affirm a conviction despite an evidentiary error when there is little likelihood that the error affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Defendant argues that the proffered evidence would have shown EH's knowledge and understanding of certain sexual acts and terms and would have provided defendant the opportunity on cross-examination to "explore in detail what EH understood or enjoyed about the

---

[4] OEC 412 provides, in part:

"(2) Notwithstanding any other provision of law, in a prosecution for [a completed or attempted sex crime], evidence of an alleged victim's past sexual behavior other than reputation or opinion evidence is also not admissible, unless the evidence other than reputation or opinion evidence:

"* * * * *

"(b) Is evidence that:

"(A) Relates to the motive or bias of the alleged victim;

"(B) Is necessary to rebut or explain scientific or medical evidence offered by the state; or

"(C) Is otherwise constitutionally required to be admitted."

videos and websites he was using and how they related to his understanding of sexual conduct, relationships, and consent." In defendant's view, the exclusion of the evidence impaired defendant's ability to refute an essential element of the charged offense, *i.e.*, EH's capacity to consent.

As noted, the state was required to prove that EH was incapable of either understanding the sexual nature of his particular conduct or exercising judgment in choosing whether to participate in the conduct based on that understanding. *Wallace*, 373 Or at 136. The trial court's speaking verdict clearly indicated that it based its findings of guilt on EH's incapability of exercising judgment in choosing whether to participate in the conduct, not on his incapability of understanding the sexual nature of the conduct. As we understand defendant's first argument, the proffered evidence would have shown only that EH was capable of understanding the sexual nature of his conduct. But that was not the basis of the court's verdict. And as we understand defendant's second argument, the proffered evidence would have shown, at most, EH's understanding of consent more generally; we do not understand defendant to argue that the evidence would have shown that EH understood the particular personal or social consequences of his particular conduct with defendant, or its transactional nature specifically. We therefore conclude that any error in excluding the proffered evidence was harmless because there is little likelihood that the error affected the verdict.

Affirmed.