122 December 12, 2024 No. 42

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

CHANCE NEAL WALLACE,
Respondent on Review.

(CC 17CR27381) (CA A170354) (SC S069898)

On review from the Court of Appeals.*

Argued and submitted June 22, 2023.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Shawn Wiley, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondent on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Before Flynn, Chief Justice, Duncan, Garrett, DeHoog, Bushong, and Masih, Justices, and Walters, Senior Judge, Justice pro tempore.**

DEHOOG, J.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

_____

 * Appeal from Jackson County Circuit Court, Lorenzo A. Mejia, Judge. 321 Or App 704, 517 P3d 323 (2022).

 ** James, J., did not participate in the consideration or decision of this case. Nakamoto, Senior Judge, Justice pro tempore, participated in oral argument, but did not participate in the consideration or decision of this case.

**DeHOOG, J.**

Oregon law prohibits sexual conduct with a person who is "considered incapable of consenting" because the person is "[i]ncapable of appraising the nature of the [person's] conduct[.]" ORS 163.315(1)(b); ORS 163.305(3).[1] At the time of defendant's alleged sexual offenses, the applicable statutes expressly included intellectual disability as a potential cause of a person's inability to consent. ORS 163.315(1)(b) (listing that factor). In this case, defendant did not dispute that the alleged victim had a qualifying intellectual disability, but he moved for judgment of acquittal on the ground that no reasonable person could find that, as a result of that intellectual disability, she was "incapable of appraising" the nature of her conduct, as the state had alleged.

The trial court denied defendant's motion and a jury convicted him of various first-degree sexual offenses. Defendant appealed. Relying on this court's prior interpretation of the relevant statutes in *State v. Reed*, 339 Or 239, 118 P3d 791 (2005), defendant argued that the state had failed to affirmatively establish that the victim's intellectual disability had rendered her "incapable" of appraising the nature of her conduct. A divided panel of the Court of Appeals agreed with defendant and reversed, concluding that the evidence produced at trial (1) "require[d]" the finding that the alleged victim "J" had understood that defendant had "initiated

---

[1] Under the Oregon Criminal Code, various sex crimes are elevated to first-degree offenses if, among other things, the victim is "incapable of consent[.]" *E.g.*, ORS 163.375 (defining first-degree rape). In 2017, when the underlying events in this case took place, a person could be deemed "incapable of consent by reason of mental defect," *see, e.g.*, ORS 163.375(1)(d) (2015) (listing that factor), if the person was "incapable of appraising the nature of the [person's] conduct." *See* ORS 163.315(1)(b) (2015) ("A person is considered incapable of consenting to a sexual act if the person is *** [m]entally defective[.]"); ORS 163.305(3) (2015) (defining "mentally defective" as being rendered "incapable of appraising the nature of the [person's] conduct" by a "mental disease or defect"). Those statutes have since been amended twice: once, in 2017, to replace the stigmatizing term "mental disease or defect" with "qualifying mental disorder" throughout the Criminal Code, Or Laws 2017, ch 364, §§ 2-17; 19-28, and a second time, in 2021, when the legislature eliminated all related references to a person's intellectual disability but retained the provision that a person lacks capacity to consent if the person is "incapable of appraising the nature of the [person's] conduct[.]" Or Laws 2021, ch 82, §§ 1-9. Unless otherwise indicated, references to the statutes in ORS chapter 163 throughout this opinion are to the 2015 versions, which remained in effect at the time of the charged crimes in 2017. We, however, use the terms "intellectual disability" or "mental disability" in place of "mental disease or defect."

sexual activity" with her, and (2) was insufficient to support a jury finding that, "because of her mental disability, J lacked the ability to exercise judgment to consent to sexual conduct." *State v. Wallace*, 321 Or App 704, 718, 517 P3d 323 (2022).

The state petitioned for review, challenging the Court of Appeals' application of *Reed* and the statutes at issue. In the state's view, the Court of Appeals essentially understood that a person is capable of "appraising the nature of the person's conduct" if the person is merely aware that another person has initiated conduct that is "sexual in nature." That flawed understanding, the state contends, led to the erroneous determination that, on the record produced at trial, no rational trier of fact could find that J had been incapable of consenting to the conduct underlying defendant's convictions. We allowed review to consider those issues, and we now conclude that the Court of Appeals erred. As we explain below, we conclude that the evidence presented at trial was sufficient to permit a reasonable trier of fact to find, within the meaning of the applicable statutes, that the victim lacked capacity to appraise the nature of her conduct and, as a result, was incapable of consent. Thus, the trial court did not err when it denied defendant's motion for judgment of acquittal on Counts 2 through 5,[2] and we, therefore, reverse the decision of the Court of Appeals and affirm the judgment of the trial court as to counts 2 and 4, and remand for further proceedings.[3]

## I.  BACKGROUND

Because the issue on review arises from the trial court's denial of defendant's motion for judgment of acquittal, we view the evidence in the light most favorable to the

---

[2] Count 1 was charged under a "forcible compulsion" theory, ORS 163.375(1)(a). Although, like Counts 3 through 5, Count 2 was charged under an "incapable of consent" theory, the trial court merged the guilty verdict on Count 2 with the guilty verdict on Count 1. The Court of Appeals affirmed defendant's conviction on Count 1, and defendant does not renew his challenge to that conviction on review. We therefore do not disturb that aspect of the Court of Appeals' decision.

[3] In the Court of Appeals, defendant unsuccessfully raised various other issues that are not at issue on review. However, because we now conclude that the trial court properly denied defendant's motion for judgment of acquittal on Count 5, we must also address an issue that the Court of Appeals found unnecessary to decide in light of its decision regarding defendant's motion for judgment of acquittal. As to that count, we reverse and remand defendant's judgment of conviction because it was the result of a nonunanimous guilty verdict. *State v. Flores Ramos*, 367 Or 292, 297, 478 P3d 515 (2020).

state to determine whether the evidence produced at trial was sufficient to allow a rational trier of fact, drawing reasonable inferences, to find the elements of the alleged crimes beyond a reasonable doubt. *State v. Hedgpeth*, 365 Or 724, 730, 452 P3d 948 (2019) (citing *State v. Clemente-Perez*, 357 Or 745, 756, 762, 359 P3d 232 (2015)). We first describe the evidence in accordance with that standard, then provide additional background regarding the underlying statutes and the trial and appellate court proceedings leading to our review.

A.   *Trial Evidence*

At trial, the state presented the testimony of various witnesses, including that of the victim, J, as well as a recording of J's forensic interview. J, who was 26 years old at the time of the charged offenses, has an intellectual disability. J's IQ is 62, due in part to fetal alcohol syndrome and in part to scar tissue on her brain resulting from an illness that she suffered during infancy. J has been diagnosed with "mild mental retardation."[4] J manages her own personal care, but she cannot live alone, shop for herself, manage her own transportation or finances, or socialize without support. She has poor short-term memory, can only go places if accompanied by a "trusted individual," and becomes overwhelmed and "shut[s] down" if tasks are not explained to her in sufficiently straightforward terms. Additionally, J tends to view the motivations of others in an optimistic light, which puts her at a heightened risk of being taken advantage of.

J lives with her grandmother, Boothe, who is her legal guardian and has cared for J full time since she was three months old. J works a part-time retail job with the help of a job coach provided by a nonprofit organization. She takes a prearranged taxi to and from work because she cannot negotiate the bus system. J's work and transportation

_____

[4] Like the term "mental defect," the terms "mentally retarded" and "mental retardation" have been recognized as stigmatizing and otherwise harmful to individuals with intellectual disabilities. *See, e.g.*, Pub L 111-256, §§ 1-4, 124 Stat 2643 (2010) (enacting "Rosa's Law"; changing references in federal law to mental retardation and individuals who are mentally retarded to "intellectual disability" and "individuals with intellectual disabilities."). We use the dated terminology in this opinion only to the extent necessary to discuss the manner in which J's intellectual disability was described in the trial court and other discussions of similar conditions in the relevant case law.

arrangements were established for J by her state-provided intellectual disability case manager, who coordinates community integration, socialization, and safety support services for J. At the time of trial, J had been working for two years but had, over that time, completed only two work shifts without any assistance.

According to J's case manager, she is a "concrete thinker" who thinks in "very black and white" terms. That is, J has difficulty with "abstract thought" and, in conversation, tends to "fixate" on tangible things without grasping any broader significance of what is being said.

Before entering the relationship that ultimately led to defendant's charges in this case, J had been curious about sex and had learned a little about sexual conduct by watching movies. However, J's "sex education" had been limited to her mother telling her that sex was a man and woman "making love" and her grandmother telling her to "wait until she was married before having sex."

Defendant met J at the church that she attended with her grandmother. Defendant started dating J a year after the two became acquainted. Defendant was generally aware of J's intellectual difficulties, and J's grandmother had specifically told defendant that J had significant "navigation" issues.[5]

When the two of them began dating, defendant was 50 years old, but he told J that he was 30. Defendant attempted, with mixed results, to control aspects of J's life. For example, defendant initially asked that J not tell her family or pastors about their relationship, and she largely complied with that request. J resisted, however, when defendant expressed preferences as to how she dressed or kept her hair, asked her for money, or asked that she refrain from using coloring books made for adults, an activity that she enjoyed.

During his relationship with J, defendant initiated sexual activity with her on a number of occasions. In one incident, defendant asked J to take off her clothes and

---

[5] As an example of J's difficulties, grandmother shared with defendant that, if they were at the movies and J got up to use the restroom, she would not be able to find her way back to her seat on her own.

helped her to get undressed. J thought that defendant's request was strange, but, because she trusted defendant, she let him remove her clothing. J testified that defendant "took some pictures of [her] personal areas," which she later clarified were her breasts and her "virginity area," the term she used to describe her vagina. Defendant told J that he took those pictures because "he wanted to look at [them] on his phone." When asked whether defendant's explanation had made sense to her, J testified, "Not really. It seemed, seemed really uncomfortable and sickening[.]" J added that it seemed "strange that he would want to take pictures of me naked."

Defendant also put his face in J's "virginity area," which did not "feel normal" to her and she did not like. J said that it felt "scary" and that she had tried to back away, but that defendant had pulled her back towards him by her legs. She further testified that she could not remember whether she had said anything to defendant about it, but she said, "I remember I didn't, I didn't like it, and it didn't feel right. I did not felt [sic] right. It did not felt [sic] normal at all." J also testified that defendant had asked her to touch his testicles. J said that "it felt uncomfortable," but he had wanted her to do it because, "to him, it felt good" and "was like a massage."

On another occasion, J recounted, defendant had put "his dick in [her] mouth." J said that defendant had "got[ten that] idea" from a video of a woman having oral sex with a man that defendant had watched on his phone. J testified that it "actually made me felt [sic] like I was going to just gag, either gag or vomit," and that she "felt disgusted like this does not feel right and this does not feel normal."

J also described an incident in which, she said, defendant had "pinned" her down and put his penis in her "butt," which had "hurt like hell."[6] She screamed, but defendant put his hand over her mouth so that his room-mate and neighbors would not hear her. Defendant stopped assaulting J when she kicked him hard enough to get him to back away. J described that incident—as well as others—as

_____

[6] J's grandmother later determined that J was referring to defendant penetrating her vagina from behind, after she had drawn J a picture of the vagina and the anus to help J understand the difference.

defendant "doing foreplay," which was a term that defendant had repeatedly used but that J did not understand. She said that defendant had also used the word "foreplay" to describe other acts that she did not like or understand, such as having her massage his testicles. Even though J herself described that "creepy and embarrassing" conduct as "foreplay," she "didn't really know what that meant."

At trial, J explained her understanding that "sex" means "male and female just making love," but said that she had not heard the term "sex education." When asked whether she had attended a sex education class in school, J answered, "I don't know." And when asked what "making love" means, J said that it was "[j]ust two people that truly love each other and respect each other," and when they "do things they have in common *** they go out to dates, they go out to movies." J understood "virginity" to "sort of" mean that "the person has never experienced sex before another virgin." J had previously heard the word "rape" and understood that "it means when the victim says no, it means no," but said that, growing up, she "didn't have a whole lot of learning process and what it really meant." She did not know the meanings of "coerce," "ejaculate," "sperm," "ovulation," "fallopian tube," or, as discussed, "foreplay." She testified that "uterus" meant "where you urinate" and that her "private part" was her "virginity area." Finally, when asked whether she knew "how to make a baby," J answered that, "if somebody truly loves each other, and have sex, then yeah that's—eventually the woman will become pregnant."

J's testimony similarly reflected confusion with respect to sexual decision making. For example, when defense counsel asked J whether she thought that she should be able to decide for herself whether to have sex with someone, she answered, "Yes, you know, if I'm ready and if I was married." But when asked whether the church says that people should not have sex before marriage, she gave a more direct response, stating that it "seems like it's the Christian way."

Throughout her testimony, J appeared to have difficulty tracking timelines, such as her age and how long she and defendant had dated, as well as how many times

incidents like those she described had occurred. Further, from her testimony, the jury could reasonably have inferred that, although J responded to questions regarding her familiarity with sexual behavior and various reproductive processes, she had difficulty understanding some of the questions and only a limited understanding of the concepts underlying them. Moreover, as the Court of Appeals noted, the jury could readily infer that J's intellectual limitations would be "obvious" to another person after only a brief interaction. *Wallace*, 321 Or App at 710. Finally, that evidence could support inferences both that defendant knew about those limitations and that J's intellectual disability had rendered her more vulnerable to manipulation than a person without such a disability.

B.  *Relevant Statutes*

The state charged defendant with various sexual offenses that he had allegedly committed against J in early 2017. A jury subsequently convicted defendant of two counts of first-degree rape, ORS 163.375(1)(a) and (d) (Counts 1 and 2, which merged into a single conviction on Count 1); two counts of first-degree sodomy, ORS 163.405(1)(d) (Counts 3 and 4); and one count of first-degree sexual abuse, ORS 163.427(1)(a)(C) (Count 5).

The state prosecuted Counts 2 through 5 under the theory that J had been "incapable of consent by reason of mental defect." At the time of the charged conduct, the statutes defining the specific offenses—ORS 163.375 (first-degree rape), ORS 163.405 (first-degree sodomy), and ORS 163.427 (first-degree sexual abuse)—all provided that the conduct that they prohibited constituted a first-degree offense if the "victim [was] incapable of consent by reason of mental defect, mental incapacitation or physical helplessness[.]"

ORS 163.315 and ORS 163.305 are related statutes. They provide, first, *when* a person is deemed incapable of consenting to a sexual act, ORS 163.315(1)(b) (a person is incapable of consenting to a sexual act when, among other circumstances, the person is "[m]entally defective"); and, second, *what* "[m]entally defective" *means*, ORS 163.305(3)

("'Mentally defective' means that a person suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person."). The text of those statutes is central to the parties' dispute on review.

C.  *Defendant's Motion for Judgment of Acquittal*

At the conclusion of the state's case-in-chief, defendant moved for judgment of acquittal on Counts 2 through 5, citing *Reed*, 339 Or at 239. He argued that, although it was "clear" that J had a limited vocabulary with which to describe sexual conduct, she nevertheless had a sufficient understanding of the conduct at issue to appraise its nature, because she understood both that the conduct occurred in a sexual context and that such conduct had potential short- and long-term consequences. Thus, defendant contended, the evidence was insufficient as a matter of law to establish that J had been incapable of consent.

The trial court denied the motion, stating that it found the state's evidence to be "more compelling" than it had anticipated when it heard a pretrial motion raising the same arguments. Pointing to the overall circumstances, J's forensic interview, her related testimony, and defendant's own, inculpatory statements, the trial court concluded that the state had produced sufficient evidence to establish, under ORS 163.305(3), that J had been incapable of appraising the nature of her conduct.

D.  *The Court of Appeals' Opinions*

Defendant appealed, assigning error to the trial court's denial of his motion for judgment of acquittal. In a split decision, a panel of the Court of Appeals held that this court's opinion in *Reed* requires "more than generalized proof of mental disability," and instead requires proof that the victim lacked the "'particularized ability' to understand the nature of the conduct that defendant initiated, *i.e.*, to understand that it was sexual, or to exercise judgment to make the choice to consent to it." *Wallace*, 321 Or App at 715-16 (citing *State v. Tilly*, 269 Or App 665, 681, 346 P3d 567, *rev den*, 357 Or 640 (2015)).

Applying its understanding of *Reed*, the Court of Appeals majority reversed defendant's convictions, concluding that (1) the record "require[d] the finding that J understood that defendant had initiated sexual activity with her," and (2) the evidence was insufficient to support a finding that, "because of her mental disability, J lacked the ability to exercise judgment to consent to sexual conduct." *Wallace*, 321 Or App at 718. The majority acknowledged that, due to defendant's "manipulations and misrepresentations," J may not have even understood that the activity that defendant had initiated with her was "sex" and not "foreplay"; it emphasized, however, that there was no evidence that the victim's intellectual disability prevented her from "understanding the sexual nature of [defendant's] conduct." *Id.* at 717-18.

Judge Mooney concurred in part and dissented in part, reasoning that a person's awareness of sexual behaviors or even an interest in learning about sex does not compel a jury to find that the person has "sufficiently-developed adaptive skills or the judgment necessary to negotiate the complex dynamics of a sexual relationship[.]" *Id.* at 720 (Mooney, P.J., concurring in part and dissenting in part). And here, given the "evidence of J's compromised intellectual capacity, mild mental retardation diagnosis," and "limited adaptive skills," Judge Mooney would have held that the jury reasonably could have found that, "because of her mental disability, [J] was not able to consent to sex with defendant." *Id.*

We allowed the state's petition for review.

## II.   ANALYSIS

Here the fundamental dispute is whether, viewing the evidence in the light most favorable to the state, a reasonable juror could find that J's intellectual disability rendered her "incapable of appraising the nature of [her own] conduct." *See* ORS 163.305(3) (defining "[m]entally defective"); ORS 163.315(1)(b) (providing that a person is "incapable of consenting to a sexual act" if the person is "[m]entally defective"); *see also Reed*, 339 Or at 244 (explaining that, for purposes of ORS 163.305(3), "the person" in "conduct of the

person" refers to the alleged victim). When, as here, a trial court has denied a motion for judgment of acquittal based upon a disputed interpretation of the statute defining the relevant offense, we must first determine whether that court correctly construed the statute, a ruling that we review for errors of law. *State v. Haley*, 371 Or 108, 112, 531 P3d 142 (2023). Then, based upon our interpretation of the statute, we must determine whether the evidence was sufficient to establish every element of the charged offense. We proceed with those inquiries in turn.

The first inquiry presents a question of statutory interpretation, which we address by applying the well-established framework articulated in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and modified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). In applying that framework, we seek to determine the legislature's intended meaning by examining the statutory text in context, taking into account any legislative history that we find helpful. *Gaines*, 346 Or at 171-72; *see also* ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible."). When interpreting a statute, we also consider any earlier opinions in which we have construed the statute itself, its statutory predecessors, or related statutes. *See Sherman v. Dept. of Human Services*, 368 Or 403, 411-12, 492 P3d 31 (2021) (considering case law at first level of *Gaines* analysis); *Polacek and Polacek*, 349 Or 278, 284, 243 P3d 1190 (2010) (relevant statutory context includes other provisions of same or related statutes, the preexisting statutory framework, and prior opinions of this court interpreting the pertinent text).

Like the Court of Appeals and both parties, we find considerable guidance in our construction of the relevant statutes in *Reed*. However, we understand that decision and its significance here somewhat differently than either party. Moreover, based on our understanding of *Reed* and the statutes at issue here, we conclude that the Court of Appeals erred in holding that the evidence in this case was insufficient to raise a jury question regarding J's ability to consent—that is, whether J was capable or incapable of appraising the nature of her conduct sufficiently to consent to the

sexual conduct at issue. We therefore conclude that the trial court did not err in denying defendant's motion for judgment of acquittal on that ground.

## A.  *State v. Reed*

We agree, as the Court of Appeals and the parties have recognized, that this court's opinion in *Reed* provides the proper starting point for our analysis. *See Sherman*, 368 Or at 411-12; *State v. Toevs*, 327 Or 525, 532, 964 P2d 1007 (1998) ("Case law interpreting the statute at issue * * * is considered at our first level of analysis."). Although the parties both expressly rely on *Reed*, they advance different arguments as to its application. Thus, we begin our assessment of ORS 163.305(3) and the meaning of "incapable of appraising the nature of [the person's] conduct" by reviewing *Reed*.

In *Reed*, this court considered whether the trial court had erred in denying a motion for judgment of acquittal as to various sexual offenses that the defendant had allegedly committed against his adult daughter, who, like J in this case, had been diagnosed with "mild mental retardation." 339 Or at 241-42, 246. The analysis in *Reed* turned on the intended meaning of "incapable of consent," which, at the time—as with defendant's charges—could be established by proving that the victim was "mentally defective." 339 Or at 243. In turn, "mentally defective" was defined in the applicable version of ORS 163.305(3) as "suffer[ing] from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person."

In evaluating that provision, this court identified the "key words" of the statute as "incapable," "appraising," "nature," and "conduct." *Reed*, 399 Or at 244. Because the legislature had not provided definitions for those terms, this court looked to "common meanings" of the text, *id.* (citing *PGE*, 317 Or at 611), which included the following:

- "'Incapable' means 'lacking capacity, ability, * * * qualification for the purpose or end in view[;] * * * lacking legal qualification or power esp. because of some fundamental legal disqualification[;] lacking the personal ability, * * * or understanding required in some legal matter[.]'"

- "'Appraise' means 'to judge and analyze the worth, significance or status of[.]'"

- "'Nature' means 'the essential character or constitution of something[.]'"

- "'Conduct' means 'a mode or standard of personal behavior esp. as based on moral principles[.]'"

*Reed*, 339 Or at 244 (quoting *Webster's Third New Int'l Dictionary* 1141, 105, 1507, 473 (unabridged ed 2002) (brackets and omissions in *Reed*)).

Applying those definitions, this court concluded that the applicable version of ORS 163.305(3) referred to a "mental defect that prevents one from appraising the nature of one's own conduct." *Id*. Further, "[t]he 'appraisal' must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct." *Id*. And, in the circumstances of that case—which to a large extent mirrored the circumstances present here—"we view[ed] that standard in the context of interactions with other persons, such as offers and proposals from other persons to engage in certain kinds of conduct." *Id*.

We acknowledged in *Reed* that "the statutory definition of mentally defective does not support the notion that a person who has a mental disability is necessarily incapable of consenting to sexual relations under all circumstances." *Id*. Rather, we explained, "a person who can understand that another person has initiated some kind of sexual activity with that person *may* be capable of appraising the nature of the conduct and, thus, *may* be capable of consenting to a sexual act ***[.]" *Id*. (emphases added). Notably, however, we did not suggest that a person who understands that another person has initiated sexual activity would *necessarily* be capable of appraising that conduct so as to preclude a finding that the person is incapable of consenting to it.

Ultimately, this court's decision in *Reed* that the trial court had erred did not turn on the precise meaning of "incapable of appraising the nature of the conduct of the person." Rather, because the applicable version of ORS 163.307(3) required that the person's incapacity be the product of the person's mental condition, *see Reed*, 339 Or

at 245 (noting state's burden of establishing by affirmative evidence that the alleged victim's intellectual disability had "rendered her incapable of consent"), and because the evidence at trial failed to make that showing, this court concluded that the state had not established that "necessary link," *id.* at 246. It was on that basis that we reversed the trial court's ruling. *Id.* at 247.

That caveat notwithstanding, we understand *Reed* to have reached the following conclusions. First, to obtain a conviction for a first-degree sex offense on the theory that the alleged victim was incapable of consenting to the charged conduct, the state must produce sufficient evidence for a rational juror to find that the victim was incapable of either (1) understanding the sexual nature of that conduct; or (2) exercising judgment in choosing whether to participate in the conduct based on that understanding. Second, for purposes of the statutes in effect at the time of *Reed* and the charged acts in this case, the state must also prove that the alleged victim has a qualifying intellectual disability. And third, the evidence must support the finding that the alleged victim's incapacity either to understand the nature of the conduct or to exercise judgment and choose whether to engage in that conduct resulted from that disability.

B.   *The Parties' Positions on Review*

On review, neither party contends that *Reed* was wrongly decided and should be overruled. Rather, the parties disagree about the extent to which *Reed*'s interpretation of the statutory provisions resolves the question presented in this case. The state notes that, under *Reed*, capability to consent to sexual conduct requires more than a mere understanding that the conduct is sexual in character. *See* 339 Or at 244 (so stating). The state emphasizes that capability to consent also requires the ability to exercise judgment in choosing whether to consent. *See id.* ("The 'appraisal' must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct.") And, in the state's view, the required ability to exercise judgment means that the person understands the societal and moral implications of the conduct at issue, or, as the state characterizes it, its "essential character."

The state argues that, unless a person understands the "essential character" of conduct at the time it occurs, they are incapable of consenting to it.

Defendant disagrees with the state's understanding of *Reed*. He does not dispute that, under the reasoning of that opinion, capability of appraising sexual conduct "can involve an understanding of the potential personal or social consequences of such conduct, such as pregnancy or social disapproval of the sexual relationship." *See id*. at 245 (noting the alleged victim's apparent "capacity to consent and to understand that having sexual relations with [the] defendant was wrong"). Defendant rejects, however, any suggestion that, to be capable of consent, one must be "capable of understanding all of the possible moral, social, and personal consequences of a decision to engage in sexual conduct[.]" Defendant also does not dispute that the relevant time for evaluating whether an alleged victim is capable of consenting is the time of the sexual conduct. But, he contends, by focusing on an alleged victim's contemporaneous understanding of the specific sexual conduct at issue (as well as of the broader moral implications of that conduct), the state misunderstands what it means to be "capable." Defendant understands the state's argument to mean that a person could lack the capability to consent at one time but then acquire that capability at a later time by coming to understand the "essential character" of their conduct through education, experience, or otherwise. In defendant's opinion, the state's argument conflates understanding-in-fact with capability of understanding, only the latter of which, he argues, is necessary for a person to be capable of consent.

In our view, *Reed* does not fully answer the statutory interpretation questions presented in this case. We agree that, under *Reed*, a person who understands that conduct is sexual in character may nonetheless be incapable of consenting to it. That follows from *Reed*'s determination that, to have that capability, the person must also be able to exercise judgment in choosing whether to consent. 339 Or at 244. But *Reed* says little about what it means to be able to exercise judgment, including whether and to what extent an ability to understand the moral consequences of sexual

conduct is essential to appraising the nature of that con-duct. Similarly, *Reed* did not specifically consider whether, to prove that an alleged victim was incapable of consenting to sexual conduct, the state must show that the person can never acquire the knowledge or skills necessary to appraise the nature of that conduct, or only that the person did not have those tools at the time of the alleged offense. Thus, we continue our examination of the relevant statutes with the parties' respective arguments in mind.

C.  *"Incapable of Consent" Amplified*

As explained above, at the time of defendant's charged conduct, various sex crimes were elevated to first-degree offenses if the victim was "incapable of consent by reason of a mental defect." Although "mental defect" had no statutory definition, its role in the statutory scheme was made clear by two other statutes, ORS 163.315(1)(b) and ORS 163.305(3).[7] First, ORS 163.315(1) provided in relevant part that:

"(1)   A person is considered incapable of consenting to a sexual act if the person is:

"*****

"(b)   Mentally defective ***[.]"

In turn, ORS 163.305(3) defined "[m]entally defective" as "suffer[ing] from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person." Together, those statutes provided that "[a] per-son is considered incapable of consenting to a sexual act" if the person "suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person."

Defendant does not dispute that J had a qualifying intellectual disability under the law then in effect. Thus, as in *Reed*, we focus our analysis on other aspects of ORS 163.305(3),

---

[7]  Although, as noted, the relevant substantive statutes in effect at the time of the alleged offenses referenced "mental defect[s]," which is not defined, it is undisputed that the meaning and application of that term are provided by ORS 163.315(1) (stating that a person is "incapable of consent" if the person is "men-tally defective"), and ORS 163.305(3) (defining "mentally defective"). We therefore focus on those two provisions.

beginning with the terms "incapable" and "apprais[e]." Starting with "apprais[e]," this court concluded in *Reed* that, when referring to whether a person is capable of appraising their conduct, the "apprais[al]" "must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct." *Reed*, 339 Or at 244. The exercise-of-judgment component reflected the definition of "appraise." *See Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002) (defining "[a]ppraise" as "to judge and analyze the worth, significance or status of"). And, although none of the terms or definitions that this court considered in *Reed* expressly referred to "the making of choices," the statutory context in which "apprais[e]" appears relates to one's capacity to give consent—that is, capacity to choose whether to allow or engage in sexual conduct. *See Reed*, 339 Or at 247 (describing inquiry as whether the alleged victim had the "ability to make choices about having sexual relations with others"). Thus, the relevant exercise of judgment relates to that choice—the decision whether to consent to sexual conduct with another—and the statute's focus is on the effect that the person's intellectual disability has on that decision.

In that context, the term "incapable" likewise focuses on the person's *decision* whether to consent to specific sexual conduct, which would seem to be the product of the person's abilities at the time they give consent, not abilities that the person may or may not be able to acquire. *See* ORS 163.315(1) (defining when a person is "incapable of consenting to *a* sexual act" (emphasis added)); ORS 163.305(3) (referring to effect of a person's mental disability on "the person['s capability] of appraising the nature of *the* conduct of the person" (emphasis added)). That understanding of "incapable" is consistent with our examination of the term in *Reed*. There, we noted that the ordinary meanings of "incapable" include "'lacking capacity, ability *** [or] qualification for the purpose or end in view,'" as well as "'lacking the *** understanding required in some legal matter[.]'" *Reed*, 339 Or at 244 (citing *Webster's* at 1141). And by equating "incapable" with a lack of "capacity," "ability," or "understanding," that definition supports the idea that a person is "incapable" of giving consent if the person lacks the intellectual tools needed to exercise judgment with regard to that decision—"the purpose or end in view,"

*Webster's* at 1141—and not only if the person is incapable of ever acquiring those tools.

Indeed, our decision in *Reed* suggested as much by stating that, to establish that a person is incapable of consent by reason of an intellectual disability, the state must prove that the person's disability "prevents [them] from appraising the nature of [their] own conduct." 339 Or at 244. There is a substantial difference between an intellectual disability that prevents a person from making an appraisal, on the one hand, and an intellectual disability that prevents a person from acquiring the ability to appraise, on the other. Thus, although it appears that a person who is presently incapable of giving consent might at some later time be found to have that capability, *see Webster's* at 3 (defining "ability," in part, as an "acquired proficiency"), the statute's focus seems to be whether a person presently possesses the requisite degree of understanding to make an informed choice. *See* ORS 163.305(3) (relevant inquiry is whether the person is "incapable of appraising the nature of the conduct of the person").

That understanding—that to be capable of consent, one must have the present ability to appraise, not merely the potential to acquire that ability—also makes sense, given the broader context of consent with regard to sexual offenses. Common sense alone tells us that, in precluding certain individuals from consenting to sexual conduct, the legislature sought to protect persons whose intellectual disabilities might otherwise render them vulnerable to sexually predatory behavior. In that regard, it would make no difference that a person presently incapable of giving consent might acquire that capability at some later time. That is, a person's potential to someday acquire the requisite ability would seem to have little if any bearing on the person's current vulnerability to predatory sexual behavior. Thus, to the extent that defendant contends that a person is not incapable of consent if their intellectual disability does not preclude them from *developing* the ability to appraise their conduct the text and context of ORS 163.315(1)(b) strongly suggest otherwise.

Turning to what a person must be capable of appraising to give valid consent—the "nature" of the person's conduct—we noted in *Reed* that "nature" means "'the

essential character or constitution of something.'" 339 Or at 244 (quoting *Webster's* at 1507). The majority opinion in *Reed* did not elaborate on that definition, such as by further explaining what constitutes the "essential character" of conduct, so it is not clear whether the majority viewed the "essential character" of sexual activity to be anything more than that—sexual.[8] Nonetheless, the state urges us to conclude that, under *Reed*, "essential character" means more than merely sexual. Concerned that the Court of Appeals' opinion unduly focused on whether J understood that defendant had initiated sexual activity with her, the state advances a more robust understanding of *Reed*, one that expands upon the meaning of "the nature of the conduct." Emphasizing *Reed*'s observation that the nature of something is defined as its "essential character," the state offers its view of what that "essential character" is for purposes of ORS 163.305(3). In the state's view, the essential character of a sexual act is more than its "sexual" quality. Rather, to understand the "essential character" of a sexual act, the state contends, one must recognize the "significance" of engaging in it, which the state argues includes two things: (1) the potential personal, social, and moral consequences of engaging in the conduct; and (2) an awareness that the person has the right to refuse to engage in that conduct.[9]

          As noted, defendant agrees that a person's awareness that sexual conduct has potential personal and social consequences may play some role in whether the person is capable of appraising its nature. He disagrees, however, that "moral" consequences are an appropriate consideration. And, to the extent that the state may contend that a person

[8] As noted earlier, the majority in *Reed* did state that "a person who can understand that another person has initiated some kind of sexual activity with that person may be capable of appraising the nature of the conduct," but it did not explicitly equate the "nature" of conduct with its characterization of "sexual activity." 339 Or at 244.

[9] The state draws its understanding in part by relying on the dissenting opinion in *Reed*. In that opinion, the dissent agreed with the majority's interpretation of the statutory text but disagreed as to its application. 339 Or at 249 (Kistler, J., dissenting). The dissent itself did not explicitly expand upon the meaning of "nature" or "essential character." Rather, based on the majority's observation that "appraise" means "to judge and analyze the worth, significance, or status of," the dissent characterized the majority's standard as asking "whether the person is capable of assessing the personal and social consequences of his or her decision to engage in that activity." *Id.* (internal quotation marks omitted).

must understand *all* personal and social consequences of a sexual activity, defendant disagrees with that as well.

As an initial matter, we agree that, when used in conjunction with "apprais[e]" in ORS 163.305(3), the "nature" of a sexual act is most likely something more than merely its sexual character. As we have explained, ORS 163.305(3) requires an ability to appraise conduct, which, as the court held in *Reed*, in turn requires an ability to exercise judgment regarding that conduct, not simply the ability to know that the conduct is sexual. Thus, we agree with the state that the ability to recognize that another person has initiated conduct that is "sexual" is not the same as being capable of appraising that conduct. That is, the mere awareness that conduct is sexual does not enable a person to judge its "significance." *See Reed*, 339 Or at 244 (defining "appraise").

That preliminary conclusion does not resolve the parties' larger dispute—whether, for a person to be capable of consenting to conduct within the meaning of ORS 163.315(1), it is necessary that they be able to recognize the "moral" implications of that conduct. Although the majority in *Reed* arguably touched on such implications when reviewing the sufficiency of the evidence in that case, *see id.* at 245 (noting alleged victim's recognition that "having sexual relations with defendant was wrong"), that opinion does not indicate whether a person's understanding of those implications plays a necessary role in assessing whether the person is capable of consent. Because the text and context of ORS 163.315(1) do not provide much guidance regarding the legislature's intent in that regard, we turn to the legislative history for further clues about the intended meaning of the statutory phrase.

D.  *Legislative History*

The legislative history of ORS 163.315 and ORS 163.305 provides a little guidance. Those provisions were originally enacted as part of the 1971 revision of the Criminal Code as proposed by the Criminal Law Revision Commission (Commission). Or Laws 1971, ch 743, §§ 104, 105. This court has long recognized that the records of the Commission and its subcommittees "provide a rich source

for determination of the drafters' intent." *State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980). When considering those records, we generally "assume in the absence of other legislative history that the Legislative Assembly accepted the Commission's explanations." *State v. Woodley*, 306 Or 458, 462, 760 P2d 884 (1988); *see State v. Henderson*, 366 Or 1, 10, 455 P3d 503 (2019) (stating the same); *see also State v. Carpenter*, 365 Or 488, 497 n 4, 446 P3d 1273 (2019) ("When evaluating statutes developed by the Criminal Law Revision Commission, we look to both the commentary and the discussions that preceded the adoption of the final draft as legislative history for the resulting laws.").

Although it is not directly at issue in this case, we note that the definition of "mentally defective" was first proposed at a May 1969 subcommittee meeting without substantive discussion. Minutes, Criminal Law Revision Commission, Subcommittee No. 2, May 3, 1969, 2; Criminal Law Revision Commission, Article 13, Preliminary Draft No. 1, Jan 1969. That definition also was not discussed at subsequent full Commission and subcommittee meetings, and it remained essentially unchanged at the time of its approval by the full Commission in January 1970. Minutes, Criminal Law Revision Commission, Jan 9, 1970, 5; Criminal Law Revision Commission, Article 13, Preliminary Draft No. 3, Dec 1969.

The commentary accompanying the definition of "mentally defective" explains that it states in the "language of contemporary psychiatry when a person is, by reason of mental disease or defect, incapable of consenting to a sexual act." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report, § 104, 104-05 (July 1970) (citing Michigan Revised Criminal Code § 2301 (e)). According to the commentary, that definition, along with definitions for "mentally incapacitated" and "physically helpless," were taken from the Michigan Revised Criminal Code. *Id.*

The commentary further explains that, although the terms "mentally defective," "mentally incapacitated," and "physically helpless" are "new to the statutory phraseology of Oregon, the concepts which they describe are not foreign to factors which the law has long recognized as

affecting one's capacity to consent." *Id.* at 106-07. It notes that, as early as 1899, Oregon recognized the "inability of [persons with intellectual disabilities] to consent." *Id.* at 107 (citing *State v. Lee*, 33 Or 506, 509, 56 P 415 (1899)).

> "The rule was early established \*\*\* that the seeming acquiescence of a [person with an intellectual disability] or of very tender years to an act of sexual intercourse afforded no defense to an action of rape, because such [a person], being ignorant of the nature of the act, was incapable of yielding consent, from a *defect of understanding*."

*Id.* (emphasis in original).

The commentary goes on to explain that, under the draft, if that "defect of understanding" renders a person incapable of appraising the nature of that person's conduct, they are "in law unable to effectively consent." *Id.* Although, consistently with our earlier assessment, the reference to the person's "defect of understanding" arguably points to the immediate effect that a person's mental disability may have on their decision whether to consent, it does little to clarify whether the legislature intended the statutes to protect only those whose mental disabilities render them permanently incapable of appraising the nature of sexual conduct, or what exactly that appraisal entails.

What is more helpful is that the commentary next discusses two cases regarding the mental capacity required by law to classify a person as "[intellectually disabled]." *Id.* (citing 93 ALR 918 (originally published in 1934)). The commentary contrasts an Iowa case, *State v. Haner*, 186 Iowa 1259, 173 NW 225 (1919), with a Texas case, *Lee v. State*, 43 Tex Crim Rep 285, 64 SW 1047 (1901). The commentary characterizes the determining factor in *Haner* as "the lack of mental capacity to know the *right or wrong* of the sexual conduct," whereas it describes *Lee* as requiring the showing of a mind "so defective as to lack power to give or withhold consent." Commentary § 105 at 107 (emphasis added). It further states that the *Haner* rule "closely approximates the rule" in the draft, whereas the *Lee* rule "would in fact abolish the legal conclusion of lack of consent of a [person with an intellectual disability] by requiring that no power to consent be present." *Id.*

In *Haner*, the court concluded that the Iowa legislature had intended its statute to protect both those who were incapable of resisting sexual conduct and those who, "while having some degree of intellectual power and some capacity for instruction and improvement," lacked the "mental strength" to offer effectual resistance to sexual advances. 186 Iowa at 1262, 173 NW at 226. The court went on to state that such persons would include individuals who are "so far below the average in mental strength" that they are "incapable of knowing or realizing the moral quality of their act[.]" *Id.*

The commentary's observation that *Haner* "closely" approximates the commission's rule is informative. That observation—and particularly the commentary's further explanation that, under *Haner*, the determining factor had been whether the alleged victim lacked the mental capacity to know the *right or wrong* of the sexual conduct—provides some support for the state's argument that the ability to "apprais[e] the nature of the conduct" as described in ORS 163.305(3) includes the ability to consider the implications of engaging in sexual conduct, not just to recognize that an act is "sexual." The commentary's reference to our own *Lee* decision arguably reflects a similar concern for individuals who may recognize sexual conduct as such but who nonetheless are deemed incapable of consenting to it.[10]

We caution, however, that, although the commentary and the cases it cites refer to person's ability to recognize whether sexual conduct is right or wrong—its "moral quality"—the focus of the statutes at issue is the alleged victim's capacity to exercise judgment regarding proposed conduct, and not whether others might view the resulting decision as morally "correct." As the commentary emphasizes, "'[l]ack of capacity to appraise the nature of [the person's] conduct' does not include appraisal involving value

---

[10] This court's opinion in *Lee* did not involve the capacity of adults with intellectual disabilities to consent to sexual conduct. Rather, that case discussed the presumed incapacity of children below a certain age to "consent to an act which is palpably wrong, both in morals and in law." *Lee*, 33 Or at 509; *see also id*. (discussing age at which one is presumed to be capable of "consenting to that particular immoral act which, when discovered, ostracizes [them] from good society"). But, at least in that context, the court and, by implication, the legislature, appear to have viewed valid consent as requiring a recognition of more than the sexual character of conduct.

judgments \*\*\*." Commentary §§ 109-11 at 112. Although that comment is arguably in tension with the commentary's earlier focus on whether a person can recognize conduct as right or wrong, we understand the latter comment to refer to external notions of morality—whether those of a person's family or community or those of a court or jury—which do not control whether an alleged victim can or has validly consented to sexual conduct. What matters is whether they are capable of exercising their own judgment regarding consent. Though, as the state argues and defendant appears to agree, that exercise of judgment may well involve some assessment of the potential personal and social consequences of engaging in sexual conduct, the ultimate question is whether the person is capable of taking such consequences into consideration in deciding whether to consent, and not whether the person's ultimate decision is subjectively right or wrong in anyone else's view.

Relatedly, the commentary suggests that, to the extent that a person must be aware that sexual conduct has personal and social consequences to be capable of consenting to it, they need not be cognizant of all such potential consequences. In addition to rejecting the notion of "value judgments," the legislature made it clear that the ability to consent does not require the "consideration of remote consequences of the immediate act." Commentary §§ 109-11 at 112. That express reference to "remote consequences" suggests that there are reasonable limits to how extensively a person must understand the potential consequences of sexual conduct before being deemed capable of consent. Thus, we agree with defendant that a person may be capable of consenting to sexual conduct even if the person does not understand—or is not even capable of understanding—all of the potential personal or social consequences associated with it, so long as their understanding is sufficient to allow them to form a judgment in light of those kinds of concerns.

As for the scope of a person's incapacity, and whether it is assessed with regard to the person's ability to ever acquire capacity or only with regard to the specific instance of conduct at issue, the legislative history of a separate provision in ORS 163.315(1)—one related to mental

incapacitation—supports the state's argument that the legislature did not intend to require the state to prove that a person would never be able to appraise the nature of their conduct.

When originally proposed, "mentally incapacitated" was defined as "rendered temporarily incapable of appraising or controlling his conduct." Criminal Law Revision Commission, Article 13, Preliminary Draft No. 1, Jan 1969. At a July 1969 full commission meeting, two commission members (Judge James Burns and Bruce Spaulding) asked why the definition of "mentally incapacitated" referred to "temporary incapability." Minutes, Criminal Law Revision Commission, July 19, 1969, 3. The chairman explained that "it was intended to refer to incapacity caused by hypnosis, narcotics or alcohol, all of which would be temporary in nature." *Id.* Spauling argued that if someone were able to "permanently incapacitate" another person with, for example, an overdose of narcotics, he too should be guilty of the offense. Another member moved to remove "temporarily," and the motion carried. *Id.* That change indicates that the legislature understood "incapacity" to have potential temporal implications. In the Final Draft Report, the commission appears to have reverted to its original position, as the final version added that "[m]entally incapacitated means that a person is rendered incapable of appraising or controlling his conduct *at the time* of the alleged offense * * *." Commentary § 104 at 104 (emphasis added); *see also id.* § 105 at 106 (clarifying that a person is "mentally incapacitated * * * *at the time* of the alleged offense" when that person is "rendered *temporarily* incapable of appraising or controlling his conduct" (emphases added)). Those changes also suggests that the legislature recognized that, if it wanted to limit incapacity to one time or another—or one form or another, such as present or permanent—it would be better to explicitly state that qualifier, something that it chose not to do with regard to the consent provision at issue here.

E.   *Summary of Statutory Interpretation*

Based on the foregoing assessment of the text, context, and relevant legislative history of ORS 163.305(3) and ORS 163.315(1)(b), we adhere to our articulation of their

meanings in *Reed*, with some clarification. As we concluded in *Reed*, for an alleged victim to be capable of consenting to a sexual act, they must be capable of appraising the nature of their conduct, and that "'appraisal' must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct." 339 Or at 244. We clarify that whether a person is capable of making that appraisal may include an assessment of whether the person recognizes that the conduct at issue has potential personal and social consequences, but no specific understanding or consideration is determinative—what matters is whether there is a basis for the jury to conclude that the person was incapable of exercising judgment regarding the significance of that conduct. Further, whether a person is capable of appraising conduct is evaluated at the time of the conduct and depends on whether the person is capable of appraising *that* conduct. The state is not required to prove that the person's intellectual disability permanently prevents them from acquiring that capability, but only that it prevented them from appraising the nature of the conduct at issue. Finally, as *Reed* specifically held, to rely on the theory that an alleged victim was incapable of consenting because of an intellectual disability, the state must establish a causal connection between that disability and the person's incapability of consenting to sexual conduct. *Id.* at 245-46.[11]

## F.   *Application to this Case*

Having interpreted the statute, we turn to whether the trial court correctly denied defendant's motion for judgment of acquittal, that is, whether the state's evidence was legally sufficient to permit a rational jury to find that J was incapable of consent under the statute as construed. On appeal, the Court of Appeals agreed with defendant, holding that the state's evidence was insufficient as a matter of law

---

[11]   In his response brief to this court, defendant argues for the first time that, as in *Reed*, the state in this case failed to establish that J's intellectual disability rendered her incapable of consenting to defendant's conduct; that is, the state did not establish that "necessary link." *Reed*, 339 Or at 245-46 (so describing the required causal connection). Because defendant has neither preserved that argument nor asked that we review it as plain error, and because, in any event, that requirement is in question following the more recent statutory change, ___ Or at ___ n 1 (slip op at 1 n 1) (discussing statutory change eliminating specific reference to intellectual disability), we do not consider it further here.

to establish that J was incapable of consenting to the sexual acts that formed the basis of defendant's charges. *Wallace*, 321 Or App at 718-19. As noted above, in reviewing whether the evidence was sufficient to go to the jury under the correct interpretation of the law, we view the evidence in the light most favorable to the state. *Hedgpeth*, 365 Or at 730. For the reasons that follow, we conclude that the evidence at trial was sufficient to go to the jury on the issue of whether J was capable of consent, and that the Court of Appeals erred in holding otherwise. Thus, we, affirm in part and reverse in part the decision of the Court of Appeals and the judgment of the trial court.[12]

In its own opinion, the Court of Appeals explained its conclusion that the evidence was insufficient to go to the jury on the issue of consent as follows. First, after recounting many of the details of J's testimony and acknowledging that J may well have misunderstood that the conduct defendant referred to as "foreplay" was in fact sex, the court held that "the evidence does not support the finding that J did not understand that the activity initiated by defendant was sexual in nature." *Wallace*, 321 Or App at 717-18. The court followed that statement with: "[H]ere, as in *Reed*, there is no evidence that J's mental disability prevented her from understanding the sexual nature of the conduct that defendant initiated." *Id.* at 718. Finally, the court concluded: "Nor would the evidence support a finding that, because of her mental disability, J lacked the ability to exercise judgment to consent to sexual conduct." *Id.* The Court of Appeals appears to have drawn that conclusion from its earlier conclusion that J necessarily understood that the charged conduct was sexual in nature, but it did not explain how one conclusion compelled the other or otherwise explain why the evidence fell short in the latter regard.

We view the evidence differently. Given J's profound confusion about what defendant was doing to her and why, her testimony that the things that he had her do (or that he

---

[12] As previously noted, our decision on this case does not affect the Court of Appeals' decision or the trial court's judgment as to Count 1, ___ Or at ___ n 2 (slip op at 3 n 2), and we summarily reverse defendant's conviction on Count 5 because it was the result of a nonunanimous jury verdict, ___ Or at ___ n 2 (slip op at 3 n 3).

did to her) were disgusting and painful, and the associations she made between sex, on the one hand, and love, marriage, and childbearing (none of which she understood to apply here), on the other, we are less confident than the Court of Appeals regarding J's understanding that the charged conduct was "sexual in nature." Even assuming, however, that no rational juror could conclude that she lacked that understanding, we disagree with the Court of Appeals' conclusion that "the evidence [could not] support a finding that, because of her mental disability, J lacked the ability to exercise judgment to consent to sexual conduct." *Id.*

We therefore conclude that the Court of Appeals erred. To illustrate why, we first revisit the facts of *Reed*. In *Reed*, we considered the alleged victim's testimony, ultimately concluding that it indicated that she was capable of consenting, specifically, to understand that having sexual relations with the defendant was wrong and that what the defendant was attempting was "not something that she wanted to do." 339 Or at 245. The alleged victim in *Reed* testified that:

- She told the defendant that she did not want to be touched when he unbuckled her belt and put his hands down her pants;

- She told defendant "Get your hands out of there. I don't want" when he unbuttoned her blouse and touched her breast;

- She pushed defendant back and told him that she wanted him to leave when he started getting "fresh" with her; and

- She was "not the type of girl to do that" when describing how defendant pulled down her pants and told her that they were in his house and that he could do what he wanted.

*Id.* Those statements—comprising the victim's clear descriptions of the incidents and characterizations of the defendant's actions as getting "fresh" with her—gave some indication that she understood the sexual nature of the conduct that the defendant had initiated. And her statement that she was "not the type of girl to do that" indicated that she understood that there were potential personal and social consequences of engaging in sexual conduct.

Here, in contrast, the evidence more clearly suggests that, even if J understood that the conduct that defendant had initiated was sexual in nature, she was not capable of appraising that conduct—of exercising judgment with regard to engaging in it. J said in her forensic interview that, when defendant had her undress so that he could take pictures of her, it seemed "strange that he would want to take pictures of me nude" and that she did not know why he had her do that. She repeatedly described the incidents as "scary" and that they "did not felt [*sic*] right" and "did not felt [*sic*] normal at all." Those statements reflect an individual who, if she understood that the conduct at issue was sexual, not only failed to make a conscious decision whether to go along—that is, exercise judgment with regard to that conduct—but who also, due to an intellectual disability, was incapable of doing so. Or so a jury could rationally find.

This court's opinion in *Reed* again helps illustrate that point. In that case, after concluding that the victim's testimony had not provided any affirmative support for the state's case, the court considered the testimony of the state's expert to determine whether it provided "affirmative evidence that, at the time of the alleged crimes, the victim had a mental defect and that that mental defect had rendered her incapable of consent." 339 Or at 245. We explained that the state's expert had provided a "general summary" of the victim's social functioning ability, testifying that the victim:

- has an IQ in the "mild to moderate mental retardation range";

- is a "very dependent person" who lives at home;

- depends on her mother for guidance and support;

- "couldn't operate" in sheltered workplace settings like Goodwill and the Salvation Army; and

- needs another adult to "direct her and care for her to assure safety in all domains, particular with regard to social functioning."

*Id.* at 246-47. The expert also testified generally about individuals functioning at a similar intellectual level, stating that they are "easily victimized," typically have a payee for their disability benefits, and need ongoing intensive

supervision to "make sure that they take adequate care of themselves and \*\*\* stay out of harm's way." *Id.* at 247.

As we noted in *Reed*, the expert in that case was never asked directly whether the victim's mental disability rendered her incapable of consenting to sexual contact. *Id.* Instead, the expert offered generalized testimony about the victim's capacity to function in other social situations, and even more generalized testimony about the social functioning capacity of similar individuals. *Id.* The state did not sufficiently connect that evidence of the victim's impaired social functioning to her alleged inability to appraise the nature of the conduct initiated by the defendant. *Id.* The state conceded as much at oral argument, acknowledging that it had not offered direct evidence of how the victim's intellectual disability had affected her ability to appraise the nature of her conduct. *Id.* We therefore concluded that, on its own, the expert's generalized testimony could not establish that the victim had been incapable of consenting to the charged sexual conduct in that case. *Id.*

Here, on the other hand, the state linked J's arguable inability to exercise judgment about defendant's sexual conduct—as opposed to merely recognizing it as sexual—to the manner in which she functioned in other social situations, which undisputedly was due to her intellectual disability. For example, J's caseworker described her as a "concrete thinker" who thinks about concepts in "very black and white" terms, has difficulty with "abstract thought," and tends to "fixate" only on the tangible aspects of communications. Relatedly, the challenges J experienced while testifying at trial reflected similar difficulties processing her thoughts. Together with her accounts of how she absorbed and responded to defendant's conduct, that evidence could support the inference that, at the time of defendant's charged conduct, J's intellectual disability rendered her incapable of appraising the nature of her conduct. Accordingly, the trial court did not err in denying defendant's motion for judgment of acquittal on that basis.

### III.   CONCLUSION

We conclude that a rational trier of fact could have found that the victim's mental disability rendered her incapable of appraising the nature of the conduct, and we

therefore affirm the denial of defendant's motion for judgment of acquittal. But because defendant's conviction on Count 5 was nonunanimous, we reverse that conviction and remand to the trial court for a new trial on that count.

The decision of the Court of Appeals is reversed in part and affirmed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.